UNITED STATES TELEPHONE CO. v. CENTRAL UNION TELEPHONE CO. et al.

(Circuit Court of Appeals, Sixth Circuit. January 10, 1913.)

No. 2,082.

1. COURTS (§ 365*)—FEDERAL COURTS—DUTY TO FOLLOW STATE COURT DECISION.

The obligation of a federal court to follow the decisions of state courts does not arise, unless the state court is a court of last resort, particularly where the opinions of the lower courts are not unanimous or numerous and old enough to show a settled rule.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 950, 952, 955, 969–971; Dec. Dig. § 365.*

Conclusiveness of judgment between federal and state courts, see notes to Kansas City, Ft. S. & M. R. Co. v. Morgan, 21 C. C. A. 478; Union & Planters' Bank v. City of Memphis, 49 C. C. A. 468.]

**2.** MONOPOLIES (§ 10*)—PUBLIC POLICY—FEDERAL AND STATE POLICY.

In general, the policies of the state of Ohio and of the United States regarding monopolies and restrictions of competition are the same; the rule being that of the common law, declared for Ohio by the Valentine Act (Rev. St. 1908, § 4427—1), and for the United States by the Sherman Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 9; Dec. Dig. § 10.*

Monopolistic contract, validity as affected by public policy, see note to Cravens v. Carter-Crume Co., 34 C. C. A. 486.]

**3.** MONOPOLIES (§ 20*)—COMBINATIONS PROHIBITED—TELEPHONE COMPANIES — LOCAL AND LONG-DISTANCE COMPANIES — CONNECTIONS — EXCLUSIVE RIGHTS.

A contract between a local telephone company and a long-distance company for a connection between their lines and the use of the local lines for the sending and receiving of long-distance messages, binding the local company not to permit any similar connection by any other long-distance company for a term of 99 years, thereby disabling it from giving its subscribers the benefit of competition in long-distance service and from extending its own service as authorized by its charter, was invalid, as tending to create a monopoly.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

**4.** TELEGRAPHS AND TELEPHONES (§ 28*)—POWERS—EXTENSION OF LINES.

Under Rev. St. Ohio 1908, § 3455, conferring on telephone companies the power to extend their lines whenever and wherever the needs of the service and good business policy may dictate, the duty of a company to furnish reasonably adequate service is not confined to the date of its organization, but it is bound to keep pace with changing conditions as they may occur from year to year; and a contract disabling it from furnishing what may be adequate service is invalid.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 16, 17; Dec. Dig. § 28.*]

**5.** TELEGRAPHS AND TELEPHONES (§ 36*)—LONG-DISTANCE SERVICE—ADEQUACY.

Long-distance telephone service is not necessarily reasonably adequate because it reaches the city or district of residence of the person with whom communication is desired.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 26, 31; Dec. Dig. § 36.*]

**6.** MONOPOLIES (§ 20*)—CONSOLIDATION BETWEEN PUBLIC SERVICE CORPORATIONS.

Statutory power to consolidate with or purchase another company will not justify a general system of contracting with a great number of other companies for exclusive mutual relation.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

**7.** MONOPOLIES (§ 20*)—RESTRAINING COMPETITION—EXCLUSIVE CONTRACTS.

A general system of exclusive contracts prima facie restraining competition, might be justified if they are for a term not beyond any such necessity, as a 99-year contract for exclusive interchange of telephone business.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

Appeal from the Circuit Court of the United States for the Northern District of Ohio; Robert W. Tayler, Judge.

*For other cases see same topic &·§ NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Suit in equity by the United States Telephone Company against the Central Union Telephone Company and another. From a decree dismissing the bill (171 Fed. 130), complainant appeals. Affirmed.

During the period prior to 1898, the Central Union Telephone Company had established a system of long-distance telephone communication extending over large parts of the states of Ohio and Indiana. It also owned and controlled local telephone exchanges in many cities and villages in this territory. The American Telephone & Telegraph Company, by license or stock ownership or otherwise, controlled the Central Union, so that the latter, with its local exchanges and long-distance lines, became allied to, and in a sense a part of, the so-called Bell System, extending throughout the United States. At the same time there also existed, in the two states named, a large number of so-called independent local telephone exchanges, often operating a local exchange in direct competition with the local exchange of the Central Union, at the same place, but not amounting to a completely competing system, because the independent local exchanges were not generally connected with each other by long-distance lines, and hence could not give to their local patrons long-distance service. It was the established practice and rule of the Central Union not to permit its long-distance lines to be used by or for the local independent exchanges, and it thus promoted its own local business by offering in connection therewith long-distance service which local competitors could not give. The bill alleges, and it is now to be taken as true, that this conduct and policy of the Central Union Company were intended for, and were effective toward, unfairly suppressing competition and oppressively establishing a monopoly in the telephone business.

In this situation the United States Telephone Company was organized as an independent long-distance company, for the purpose of furnishing long-distance service to the independent exchanges in the two states named and adjacent territory. It proceeded to, and did, expend several million dollars in the construction of such lines, and in connection with this planning and development it negotiated and made contracts with a large number of independent local exchanges in Ohio, Indiana, and Michigan, which contracts provided for an interchange of business, "so that a comprehensive and adequate independent telephone system was thereby created." This independent system thereupon entered into and carried on a general telephone business, competing with the Bell system in the territory named, and in about 1907, it had been so successful that it was furnishing long-distance service for 800 independent exchanges, 2,000 independent stations, and 700,000 telephones. Up to the time last named the Central Union Company had adhered to its policy of refusing to furnish service to independent exchanges, but at about that time it abandoned that policy, in whole or in part, and began to solicit an exchange of business with the local independent companies; in other words, the Central Union Company entered into active competition with the United States Company for the long-distance business of the independent local exchanges. The contracts above named, between these exchanges and the United States Company, provided that, for points reached by that company, they should give their long-distance business exclusively to that company and receive long-distance business from that company alone, so that this new policy of the Central Union Company amounted to soliciting the independent exchanges to break their contracts with the United States Company. Several independent exchanges accepted the offers made by the Central Union Company, and entered into interchange arrangements with it.

Against two or three of such independent local exchanges, the United States Company filed injunction complaints, and obtained injunctions in the common pleas court of Ohio. The Central Union Company continuing such solicitation, the United States Company filed this bill in the United States Circuit Court for the Northern District of Ohio, asking an injunction against the continuance of such acts. The defendants demurred, and the Circuit Court dismissed the bill. The United States Company appealed to this court. The hearing of the appeal was long delayed, awaiting the decision of the Supreme Court of Ohio; but that decision, when rendered, was not controlling, as

hereafter explained, and accordingly the appeal has been argued and submitted to this court.

W. L. Cary, of Columbus, Ohio, and Cable & Parmenter, of Lima, Ohio, for appellant.

John H. Doyle, of Toledo, Ohio, Murray Seasongood, of Cincinnati, Ohio, and W. B. Mann, of Indianapolis, Ind. (Paxton, Warrington & Seasongood, of Cincinnati, Ohio, and Doyle & Lewis, of Toledo, Ohio, of counsel), for appellees.

Before KNAPPEN and DENISON, Circuit Judges, and SATER, District Judge.

DENISON, Circuit Judge (after stating the facts as above). After the decision of the present case by Judge Tayler in the court below, an appeal from the common pleas court, in one of the injunction cases, was affirmed by majority vote of the circuit court (in Ohio, an intermediate appellate court). This was carried to the Supreme Court. The Supreme Court of Ohio has six members. Five sat to hear this case, and the decree of the circuit court was affirmed by a vote of three to two, but without any opinion. It is the fixed rule of the Supreme Court in Ohio that the law, as settled by the decision, is to be found only in the syllabus. Adelbert College v. Wabash R. R. Co. (C. C. A. 6) 171 Fed. 805, 812, 96 C. C. A. 465, 17 Ann. Cas. 1204. Under these circumstances, it is said that we should not examine for ourselves the questions involved, but should adopt the same disposition of the matter as was reached in the Ohio Supreme Court.

[1] Counsel do not agree as to whether the action of the state courts was in such sequence of events, or whether that action so involved the construction of the state statutes or state policy only, rather than federal statutes or matters of general law, that it would be our duty to adopt the conclusion of those courts; but we see no necessity for considering that problem. It is clear that the obligation to follow the lead of the state courts does not arise, unless the court to be followed is the court of last resort in the state (Anglo-American Co. v. Lombard [C. C. A. 8] 132 Fed. 721, 742, 68 C. C. A. 89); and particularly so when the lower court opinions are not unanimous or numerous and old enough to show a settled rule. We think we must interpret the action of the Supreme Court of Ohio as a declaration that, lacking concurrence by a majority of the court, it was unwilling to lay down any general rules or principles as applicable to the existing situation. Under these circumstances, we feel bound to decide the issues according to our own judgment.

The court below based its conclusion largely upon the ground that the exclusive feature of the contracts between the independent locals and complainant was in itself unlawful and void, as tending to unlawful trade monopoly. If that court was right in this, all the other questions argued become immaterial, and so that question is naturally the first to be considered. This necessitates a more careful statement of this feature of the contracts.

Taking one of the contracts as typical, we find that the long-distance company (complainant) agrees to build a line to the corporate

limits of the village, and thence upon the poles of the local company to its central exchange in the village, receiving a license to use therefor the poles of the local company's village lines; that service will be given from all lines owned, controlled, or connected with the lines of either party over the lines of the other party and its connections; that neither party will enter into contract with any other person or corporation whereby any of the rights, privileges, or advantages acquired by this contract might be impaired; that the long-distance company will transmit, over the lines owned or controlled by the local company, all messages destined to points thereon, and not reached by the long-distance company's own lines; that the local company will transmit over the lines of the long-distance company all messages to points "not now reached" by the local company's own lines (as shown by the attached plat of existing local lines); that the tolls and charges shall be divided in agreed proportions; and that the contract shall remain in force for 99 years.

[2] Speaking generally, the policies of the state of Ohio, and of the United States, regarding restrictions of competition, are the same; if there are differences, they are immaterial here. The rule is that of the common law, declared for Ohio by the Valentine Act, and for the United States by the Sherman Act. Salt Co. v. Guthrie, 35 Ohio St. 666; section 4427—1, R. S. Ohio; Standard Oil Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200); State v. Buckeye Pipe Line Co., 61 Ohio St. 520, 548, 56 N. E. 464; State v. Gage, 72 Ohio St. 210, 73 N. E. 1078. That any particular class of business should be exempted from this prevailing policy would require clear and explicit legislative declaration to that effect. The courts cannot make such exemptions, merely because forceful reasons can be stated why such particular business is a "natural monopoly." If it is, this only means that the Legislature might well have made an exemption, or, at most, that in a judicial determination of what amounts to a substantial and direct restraint, rather than an incidental or indirect restraint, the courts will give due regard to the character of the business under consideration. Of the present situation, it is enough to say that we are cited to no Ohio statute in force when this controversy arose expressly exempting telephone companies from the general policy adopted by the state for other kinds of business; nor is there any such exemption in the federal statutes.

It also seems clear, and is not denied, that the carrying on of telephone business is trade and commerce within the proper meaning of those terms, and one of the kinds of business in which it is the general purpose of the law that all citizens should be at liberty to engage on equal terms.

[3] With these premises, the prima facie restrictive character and monopolistic tendency of the contracts in question can hardly be denied. The local company has tied up its long-distance business. It cannot take general advantage of competition from time to time arising, no matter how advantageous to it or its patrons, and it cannot

expand its own business and extend its own lines beyond its then existing limits into competition with the long-distance company, no matter how advisable such extension and competition might prove to be. This is from the standpoint of the local exchange, but similar results are apparent from the other standpoint. The long-distance company not only forestalls competition likely to arise through the extension of the local company's lines, but by its system of these contracts there was a direct plan and effort to monopolize in the long-distance business so much of the field as it could cover. A general system of contracts may be obnoxious to an anti-trust law, though the individual contract would not be. United States v. Reading Ry., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. ——. These contracts, therefore, must be condemned because "adopted for and adapted to" [1] restraint of trade and monopoly, unless they escape that condemnation for the reasons hereafter to be considered.

[4] Another consideration leads to the same result: These local exchanges, organized under the Ohio statutes, were public service corporations bound to give reasonably adequate service. Cumberland, etc., Co. v. Kelly (C. C. A. 6) 160 Fed. 316, 87 C. C. A. 268, 15 Ann. Cas. 1210; Postal Co. v. Cumberland Co. (C. C.) 177 Fed. 726. It is true that they were not charged with an express duty to give long-distance telephone service, but neither were they confined to strictly local service. They had power to extend their lines whenever and wherever the needs of the service and good business policy might dictate (section 3455, R. S. Ohio), and their obligation to furnish reasonably adequate service is not confined to such exact definition of that term as might have been given at the time of the organization. Every such charter contemplates that conditions will change from year to year and from decade to decade, and that the obligation of the company shall be to give that service, which, at the future time when the question arises, is then, and in view of the conditions then existing, reasonably adequate. It is now a matter of common knowledge that long-distance communication is a practical necessity to the perfection of the service rendered by a local exchange to its subscriber, and this situation, while not as clear and certain in 1900 as it is in 1912, must be deemed to have been then within the contemplation of the parties and of the law.

[5] A long-distance telephone service is not necessarily reasonably adequate just because it reaches the city or district of residence of the person with whom communication is desired. A railroad service may be beyond criticism if all passengers and freight are deliverd at one station in a city, from which station the passengers go their several ways, and to which station consignees come for their freight; a telegraph service may be complete if the messages reach over the wire only one central office, from which they are distributed by other means; but in telephone communication the ultimate thing sought is personal conversation, and a long-distance telephone service has not reached its full usefulness until the user, in one place, can talk directly with the

[1] Judge Knappen's phrase in Bigelow v. Calumet & Hecla Co. (C. C.) 155 Fed. 869, 875.

residence or place of business of the telephone users in another place. It is not now important where the line will be drawn in determining what is reasonably adequate service. That will depnd upon many conditions, some of which cannot be foreseen. It is enough to say that where a local telephone company contracts that it will not send or receive *any* long-distance messages, excepting in co-operation with one specified long-distance company, it thereby abdicates its power to give a service which may turn out to be clearly within any proper definition of "reasonably adequate."

Nor are we concerned with the question whether the local exchange could, in 1900, have been compelled, or might now be compelled, to give this long-distance service against its will. We consider only the fact that by these contracts the local companies partially disabled themselves from performing what might become a portion of their public duties, and hence, for that reason also—and unless the controlling justification appears—the contracts are invalid.

[6] We come, then, to the inquiry whether there is sufficient reason for exempting these contracts from their prima facie invalidity; and the first point urged to this effect is that, by statute, the long-distance company and the local company each had power to purchase and consolidate with the other, and that, as the greater includes the less, this power of consolidation necessarily implies the power to contract for exclusive, mutual relations. The statutes did give this power of purchase or consolidation (section 3455, supra); but such general powers must be construed as subordinate, not paramount, to specific prohibitions of monopolistic combination (Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679). Nor does the power to consolidate or combine with another company reach to a system of identical or similar contracts with hundreds of other companies, resulting in a general combination. The essential evil may be in the system, but not in the single contract.

Further, on the subject, as Judge Tayler said below:

"The fallacy of this particular contention is to be found in the fact that the lessee or consolidated company is not by the act of lease or consolidation disabled to perform any of its duties which by law may have rested on the lessor on constituent company. There still remains in either case—lease or consolidation—a company operating the local telephone system, and upon it rests, as formerly rested on the constituent local company, the duty which the law laid upon it. Whatever may be the temper or the policy of the successor company, respecting the matter of continuing to monopolize the local and long-distance business of the community, it will not by such lease or consolidation have parted with the power to give competitive service. Thus it will continue to have power to satisfy the legal necessities springing out of the fact that it is a corporation."

It will be noticed that these exclusive contracts have the effect, not only to require the local company to give its long-distance business to the United States Company as against any long-distance competitor like the Central Union, but also to prohibit the local company from extending its own lines in competition with the United States Company. As will be seen from the statute cited, it had the charter power to extend its own lines wherever the good of its stockholders and the

benefit to the public might, from time to time, dictate. So far as such extensions might compete with the lines of the United States Company, then or thereafter established, this power of extension was, by the contracts, abrogated. This consideration adds force to the extract just quoted from Judge Tayler's opinion.

[7] It is next urged that these contracts should be approved because, in spite of their restrictive and monopolistic tendencies, their net character tended in the contrary direction, so that they really promoted, instead of restraining, competition. This is because, in 1900, the long-distance field, so far as occupied at all, was exclusively held by the Central Union Company, which (the demurrer admits) was a monopoly maintaining its position by unlawful means, and because it was impossible to promote and establish a competing long-distance system unless that system was in advance assured of business from independent exchanges, which assurance could be had only by exclusive contracts. We consider this argument as depending upon the principles which have been most recently discussed by Mr. Justice Lurton, in the Reading Case (supra) with reference to the 65 per cent. contracts, and it amounts to saying that the restraint and monopoly found in these telephone contracts were not their main and characterizing purpose and effect, but were the indirect and necessary incidents of contracts which operated primarily for promoting competition—hence, they cannot be condemned. It may well be that if a system of monopoly is found so entrenched that competition cannot get a start, except by providing itself in advance with a system of exclusive contracts, then, in such case and in so far as this is necessary to get competition, the exclusive contracts may become a mere incident of the generally lawful enterprise. However, it is clear that this exemption cannot go beyond the necessity of the case, and the bill in this case indicates no necessity requiring or justifying 99-year contracts. These are practically perpetual contracts. Within that period, the entire subject-matter might, and very likely would, change its essential character over and over again. We cannot undertake to suggest the term of exclusive contract which would be reasonable, so as to permit the use of such a means for getting a rival company into the field. The term of a patent may furnish some analogy. Different circumstances may justify different terms. The term might be such as to make it very difficult to decide upon which side of the line it lay. We need not speculate about these things, because we are clear that the 99-year restriction found in these contracts goes far beyond any inherent necessity for the purpose suggested, and so cannot be justified as properly incidental to a lawful purpose.

Several other reasons are urged for sustaining the validity of these contracts in spite of what we have called their prima facie invalidity, but we find none of these reasons as forceful as the two which we have discussed; nor does any one of the decisions which have been pressed upon us seem persuasive in opposition to the conclusions we have expressed. A review of these cases would be unprofitable. No one of them has reference to a system of hundreds of identical or similar contracts covering large parts of three states, running for a period of time which is practically perpetual, and operating to abrogate a

part of the powers of public service corporations, and covenanting that the powers not wholly abrogated shall not be exercised as they might otherwise have been and as may prove to be essential to giving good service and to avoiding monopoly. For example, in Chicago, etc., Co. v. Pullman, etc., Co., 139 U. S. 79, 11 Sup. Ct. 490, 35 L. Ed. 97, a contract by the railroad to give to the Pullman Company the exclusive right to furnish sleeping cars to the railroad was sustained; but the contract was for a period of only 15 years, and contained an option by which, if unsatisfactory, it might be terminated in 5 years. Such a contract was, essentially, of a different character from those now involved, because of the entire practicability of exchanging long-distance telephone business with more than one company, contrasted with the practical difficulties which might attend the attempted use of the same railroad track for sleeping cars of different systems; but, aside from this practical distinction, the opinion does not indicate to us that the exclusive sleeping car contract would have been sustained if it had been for the period of 99 years, and if it had been one of a system of similar contracts covering or attempting to cover all the railroads in a large territory. The Supreme Court has also sustained exclusive contracts for hauling express cars (St. Louis, etc., Co. v. Southern Exp. Co., 117 U. S. 1, 6 Sup. Ct. 542, 628, 29 L. Ed. 791); but this is less analogous than the Pullman Case. On the other hand, the view we take is supported, more or less perfectly, by Beasley v. Texas Pac. Ry. Co., 191 U. S. 492, 497, 24 Sup. Ct. 164, 48 L. Ed. 274; State v. Telephone Co., 36 Ohio St. 296, 38 Am. Rep. 583; South Chicago, etc., Co. v. Calumet, etc., Co., 171 Ill. 391, 49 N. E. 576; Central, etc., Co. v. Averill, 199 N. Y. 128, 92 N. E. 206, 32 L. R. A. (N. S.) 494, 139 Am. St. Rep. 878; State v. Cadwallader, 172 Ind. 619, 87 N. E. 644, 89 N. E. 319.

We are not unmindful that the result of affirming the decree below is to compel what is said to be the weaker of the two companies to defend itself against commercial aggression from the stronger by some other means than merely standing upon these contracts which it had provided for such defense; but, in applying rules of this kind, we must look to the future as well as to the present. Sustaining these contracts might, for the time being, aid the weaker and so help to maintain competition; but it would at the same time point the way by which, in case of the voluntary or involuntary combination of these two companies, all competition or possibility of competition would be, for 99 years, excluded. This entire phase of the question is so well stated by Judge Tayler that we quote with approval this part of his opinion:

"The position which counsel for complainant take comes to this when we analyze it: The Bell Telephone Company is a wicked monopoly. Some years ago the United States Company concluded to fight it. The only way to fight the devil was with fire. The only way to fight the monopoly was to monopolize all unoccupied territory. The way to monopolize this unoccupied territory was to go to a local telephone company which had no long-distance connection and offer to give it such a long-distance connection, provided a perpetual monopoly of it was given in return.

"This purpose to destroy the Bell monopoly may be admitted to be virtuous. The method resorted to was vicious. It was a mere repetition and imitation

of the methods which, when followed by the Bell Company, are so bitterly denounced. The philosophy that the end justifies the means, when the end is virtuous and the means vicious, has long since been discarded, if it ever had any avowed supporters. But even that philosophy cannot apply to a mere business undertaking. The purpose to destroy the telephone monopoly was not a virtuous purpose; it was a business proposition, which incidentally led, we may assume, to a righteous result. What becomes of the righteous result when the means to accomplish it are the means of unrighteousness? The ultimate result of which may be that we discover we have exchanged one master for another, or if not, that we have emphasized the strength of the former master. Counsel, of course, will not deny that if the Bell Company should acquire control of the complainant, these contracts would be just as valid and the shield of our defense would be turned into a weapon with which to destroy us.

"Are the courts to turn themselves into inquisitors of the minds of men and say: 'Here is a man who wants to do the world some good? The ultimate result promises to be beneficial, but, in order to accomplish it, he must monopolize the business of some community and must violate the law. May he do so?' These questions were long ago answered, and yet they come up again and again.

"The sum of all this is that it does no good to destroy one monopoly by creating another. Monopolies all look alike to the law. When they use their power unlawfully, it is for the law to take suitable steps to punish the offender and prevent recurrence of the offense."

The decree below is affirmed, with costs.