## UNITED STATES v. AMERICAN MEDICAL ASS'N et al.

### No. 7488.

United States Court of Appeals for the District of Columbia.

Argued Jan. 12, 1940.

Decided March 4, 1940.

Writ of Certiorari Denied June 3, 1940.

See 60 S.Ct. 1096, 84 L.Ed. ——.

Thurman Arnold, Asst. Atty. Gen., and John Henry Lewin and Grant W. Kelleher, Sp. Assts. to Atty. Gen., for appellants.

William E. Leahy, Seth W. Richardson, John E. Laskey, and Charles S. Baker, all of Washington, D. C., and Edward M. Burke, of Chicago, Ill., for appellees.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

GRONER, C. J.

This appeal is taken from a judgment of the United States District Court sustaining a demurrer to an indictment for conspiracy in restraint of trade in the District of Columbia, in violation of Sec. 3 of the Sherman Anti-trust Act.[1]

The main purpose of the conspiracy as shown in the indictment was to impair or destroy the business and activities of Group Health Association, Inc., which had been organized in 1937, as a non-profit co-operative association for the provision of medical care and hospitalization to its members and their dependents. The indictment is very long but, summarized, charges as follows:

Group Health is an association of employees of certain executive departments of the Government employed in the District of Columbia, eighty per cent earning annual incomes not over $2,000. The as-

---

[1] 26 Stat. 209, 15 U.S.C. § 3, 15 U.S.C.A. § 3.

sociation provides medical care and hospitalization to its members and their dependents on a risk sharing prepayment basis. Its funds are collected monthly in the form of dues. Medical care is provided by its medical staff, consisting of salaried physicians under the sole direction of a medical director. It provides a modern clinic and defrays, within certain limits, the expenses of hospitalization of its members and their dependents. The personal relationship ordinarily existing between doctor and patient exists between Group Health doctors and Group Health patients.

Defendant American Medical Association is a corporation with a membership of 110,000 out of the total of 145,000 physicians in the United States. It is the only important national society representative of the medical profession in the country. It maintains a "Bureau of Medical Economics", which has taken a leading part in carrying out the association's policy of discouraging and suppressing group medical practice on a risk sharing prepayment basis.

Defendant The Medical Society of the District of Columbia is a constituent society of American. Defendant Harris County Medical Society is a component society of American. Members of constituent and component societies are ipso facto members of American. Washington Academy of Surgery is an unincorporated association with its office in the District of Columbia. Of the individual defendants, five were officers of American, and the others members of District Society, most of the latter being officers or else members of the executive and hospital committees of the Society or members of the regular staffs of Washington City hospitals. American Association and District Society possess power to exclude a doctor, disapproved by them, from attending and treating his patients in the Washington hospitals, which include all the hospitals in the District of Columbia in which private patients may be treated by doctors. By enforcing their rules of ethics and expelling members, they may deprive them of the essential privilege of consultation with other members. By granting or refusing approval of hospitals, they can control the ability of hospitals to obtain internes, and by threatening hospitals with the exercise of this power, they may control the members of medical staffs in each. To carry out these powers,

on November 3, 1937, District Society adopted the following resolution:

"Whereas The Medical Society of the District of Columbia has an apparent means of hindering the successful operation of Group Health Association, Inc., if it can prevent patients of physicians in its employ being received in the local private hospitals; and

"Whereas, The Medical Society of the District of Columbia has no direct control over the policies of such hospitals as determined by their lay boards of directors, except through its control of its own members serving on their medical staffs; and

"Whereas, conflicts between the Medical Society of the District of Columbia and any local hospitals arising from an attempt to enforce the provisions of Chapter IX, Article IV, Section 5, of its Constitution should be assiduously avoided, if possible, because of the unfavorable publicity that would accrue to its own members; therefore, be it

"Resolved, That the Hospital Committee be, and is hereby, directed to give careful study and consideration to all phases of this subject and report back to the Society, at the earliest practicable date, its recommendations as to the best way of bringing this question to the attention of the medical boards and boards of directors of the various local hospitals in such a manner as to insure the maximum amount of practical accomplishment with the minimum amount of friction and conflict."

Subsequently, the conspiracy was discussed at meetings held by members and committees of District Society, with the purpose of "hindering" Group Health from procuring and retaining on its medical staff qualified doctors by threatening with disciplinary action any members of District Society who should either join Group Health's staff or consult with physicians on its staff, and with the purpose of hindering and obstructing members of Group Health from obtaining access to hospital facilities and obstructing the doctors on its staff from treating and operating upon patients in Washington hospitals, and for the purpose of inducing Washington hospitals to boycott Group Health and its doctors. A "white list" of approved organizations, groups, and individuals was circulated, with the name of Group Health omitted,—all for the purpose of threatening with disciplinary action any member

of the District Society who worked for Group Health or consulted with any doctor on its staff and any hospital which admitted any Group Health doctor to its courtesy staff;—the general purpose of the conspiracy being to restrain doctors in the District of Columbia in the pursuit of their calling and to restrain the hospitals in the operation of their business and to destroy Group Health in the performance of its functions. Disciplinary action was taken against two District Society members on Group Health's staff. One was induced to resign from the staff, the other was expelled from the society. Harris County Society opened disciplinary action against one of its members on the staff. District Society opened disciplinary action against a specialist who consulted with a Group Health doctor. Demand was made on the hospitals that they receive only members of the American Medical Association on their staffs. Upon recommendation of Washington Academy of Surgery, a surgeon was excluded from hospital staffs principally because he was working for Group Health. By threatening to deprive another doctor of courtesy staff privileges, defendants induced a Group Health doctor to resign his position.

The conspiracy is charged to have had as its background the long continued policy of opposition on the part of American Medical Association to risk sharing plans for medical service, growing out of the fear of its members of business competition from doctors connected with such organizations. Each defendant is charged to have knowingly participated in the formation and furtherance of the plan pursuant to the common purpose.

The several defendants demurred on a number of grounds, attacking not only the substance but the form of the indictment.

The District Court sustained the demurrer (1) because the practice of medicine is not a trade within the meaning of Sec. 3 of the Sherman Act; (2) because the indictment is vague and uncertain and fails to charge clearly commission of any crime.

The United States have appealed under the provisions of the Act of March 3, 1901, ch. 854, 31 Stat. 1341, D.C.Code 1929, Tit. 6, sec. 355.

The case divides itself into three main problems:

1. Does the indictment charge a combination or conspiracy in restraint of "trade" as that term is used in Sec. 3 of the Sherman Act?

2. If it does, is the restraint charged an unreasonable one which would be illegal under the Act?

3. Is the indictment defective in form?

Sec. 3 of the statute reads as follows: "Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in * * * the District of Columbia * * * is hereby declared illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars [$5,000], or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

 The trial court was of opinion that the practice of medicine and the business of Group Health and the hospitals do not constitute "trade" within the intent of the statute. The question is new, at least to the extent that there is no case in which, in the circumstances existing here, it has been decided, but a careful consideration of the language of the Act, its legislative background and the various statements of the Supreme Court concerning the source from which the congressional purpose may be gathered, leads us to conclude the trial court was in error.

The phrase "restraint of trade" had its genesis in the common law, and its legal import and significance is declared again and again in the decisions of English courts, both before and after the date of our independence, as well as in American decisions in many of the States. The Supreme Court has said that Congress passed the Sherman Act with this common law background in mind. And so in the Standard Oil case,[2] Chief Justice White traces its use to the common law. Thus, at the top of page 51 of 221 U.S., 31 S.Ct. at page 512, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann. Cas.1912D, 734, he says: "It is certain that those terms, at least in their rudimentary meaning, took their origin in the

---

[2] Standard Oil Co. v. United States, 221 U.S. 1, 50-60, 31 S.Ct. 502, 55 L. Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734.

common law, and were also familiar in the law of this country prior to and at the time of the adoption of the act in question."

And again: "It is certain that at a very remote period the words 'contract in restraint of trade' in England came to refer to some voluntary restraint put by contract by an individual on his right to carry on his trade or calling. Originally all such contracts were considered to be illegal, because it was deemed they were injurious to the public as well as to the individuals who made them."

And still again, 221 U.S. at page 59, 31 S.Ct. at page 515, 55 L.Ed. 619, 34 L.R.A., N.S., 834, Ann.Cas. 1912D, 734:

"Let us consider the language of the 1st and 2d sections, guided by the principle that where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary.

* * *

"In view of the common law and the law in this country as to restraint of trade, which we have reviewed, and the illuminating effect which that history must have under the rule to which we have referred, we think it results:

"a. That the context manifests that the statute was drawn in the light of the existing practical conception of the law of restraint of trade, because it groups as within that class, not only contracts which were in restraint of trade in the subjective sense, but all contracts or acts which theoretically were attempts to monopolize, yet which in practice had come to be considered as in restraint of trade in a broad sense."

Similar statements are to be found in United States v. American Tobacco Co., 221 U.S. 106, 179, 31 S.Ct. 632, 55 L.Ed. 663; Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232; Eastern States Retail Lumber Dealers Ass'n v. United States, 234 U.S. 600, 610, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 278, 279, 46 L.R.A. 122, affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; United States Tel. Co. v. Central Union Tel. Co., 6 Cir., 202 F. 66, 70. There are like statements in the debates in Congress. 21 Cong. Rec. 3146, 3148, 3152. And see Judge Taft's opinion in the Addyston Pipe Co. case, where he said[85 F. 278]: "It is certain that, if the contract of association which bound the defendants was void and unenforceable at the common law because in restraint of trade, it is within the inhibition of the statute * * *."

In Leonard v. Abner-Drury Brewing Co., 25 App.D.C. 161, 174, we said as much with respect to Sec. 3 of the Act. It must, therefore, be considered that the scope of "restraint of trade" in Sec. 3 is to be measured by its use at common law.

The common law rule was applied principally to contracts whereby a man promised not to engage in his occupation, including the practice of medicine, and in many English cases such a restraint on the practice of medicine was described as a contract in "restraint of trade". Defendants contend, however, that whatever the English usage, the word "trade" had in this country a definite and well understood meaning, and as used in the Sherman Act was confined to transportation and the buying, selling, or exchanging of commodities and in any case was not intended to apply to any employment or business carried on by the "learned professions". The determination of this aspect of our problem lies in the answer to this proposition.

In Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 52 S.Ct. 607, 76 L. Ed. 1204, it was held the words "trade" and "commerce" had a broader meaning in Sec. 3 of the Act than in Sec. 1, 15 U.S. C.A. §§ 3, 1, and that, under the paramount power of Congress to legislate for the District of Columbia, the use of the words in that section should be held to embrace the exercise of that paramount power to its fullest extent.—"We are, therefore, free to interpret section 3 dissociated from section 1 as though it were a separate and independent act, and, thus viewed, there is no rule of statutory construction which prevents our giving to the word 'trade' its full meaning, or the more extended of two meanings, whichever will best manifest the legislative purpose." 286 U.S. at page 435, 52 S.Ct. at page 609, 76 L.Ed. 1204.

Cleaners and dyers in the District had formed a combination to keep up prices, and the United States brought suit to enjoin the agreement and reestablish compe-

tition. The defendants insisted their arrangement was not a violation of Sec. 3 because they were not engaged in trade, relying upon National League Clubs v. Federal Baseball Clubs, 50 App.D.C. 165, 168, 269 F. 681, 684, holding that "trade" connotes the transfer of something, "whether it be persons, commodities, or intelligence, from one place or person to another". The opinion ignored the citation, doubtless because the baseball case was brought under Section 1—the interstate commerce section of the Act—and Justice Sutherland, who wrote the opinion, rejected this restricted definition as applied to Sec. 3. In support of a definition to include the cleaning business, he quoted from Justice Story's opinion in The Nymph, 18 Fed.Cas. No. 10,388, page 506: "* * * the word 'trade' is often and, indeed, generally used in a broader sense, as equivalent to occupation, employment, or business, whether manual or mercantile. Wherever any occupation, employment, or business is carried on for the purpose of profit, or gain, or a livelihood, *not in the liberal arts or in the learned professions,* it is constantly called a *trade.*"

The learned trial judge felt that the italicized words should be regarded as an authoritative statement of the Supreme Court that the professions were not trades and therefore not within the intent of the Act. But we think this by no means follows. The Court had before it only the problem whether "trade" was broad enough to include the cleaning and dyeing of clothes, and held it was. To reinforce its reasoning, the Court quoted language which happened to exclude the learned professions, but this limitation was not responsive to the question at hand and was purely casual, and in the circumstances ought not, we think, to be regarded as a proper guide in deciding the important question in this case.

The same might be said of Federal Trade Com. v. Raladam Co., 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191, where Justice Sutherland said that physicians followed a profession and not a trade. He was dealing with a case of interstate commerce and simply pointed out the obvious fact that doctors were not in the patent medicine trade, and could not be in competition with vendors of medicine within the sense of the Trade Commission Act. There, he was using the word "trade" in its narrowest sense, a restriction which, as we have seen, he later rejected in regard to Sec. 3 of the Sherman Act.

The common law cases which shed light on the question are all of a type. A physician, a surgeon, or a dentist has an established practice in a community. He takes on an assistant, or a partner, or else sells his practice to another of his own profession. In the first two cases he wants to protect his own practice, and in the third case the buyer wants protection from subsequent competition by the seller. Consequently, the assistant, or partner, or seller, as the case may be, promises for a consideration not to practice within the community or within a designated distance. This promise is a voluntary restraint on the pursuit of a man's calling, and in the circumstances, the public policy described by Chief Justice White in the Standard Oil case becomes involved. The restraint will be upheld only if it (1) is partial; (2) is made for an adequate consideration; and (3) is reasonable as a protection of the good will of another's professional practice. Holbrook v. Waters, 9 How.Prac., N.Y., 335.

In England such a contract was constantly referred to as involving the doctrine of "restraint of trade". See Davis v. Mason, 5 T.R. 118, 101 Eng. Rep. 69; Hayward v. Young, 2 Chitty 407; Atkyns v. Kinnier, 4 Ex. 776, 154 Eng. Rep. 1429; Gravely v. Barnard, L.R. 18 Eq. 518. In all of the above the lawyers who raised the point and the judges who passed upon it referred to the public policy as the doctrine of restraint of trade, contracts in restraint of trade, or in partial restraint of trade. In Horner v. Graves, 7 Bing. 735, 131 Eng. Rep. 284, defendant had promised not to practice within 100 miles of York. The opinion of Tindall, C. J., recognizes the occupation of surgeon-dentist as a profession, but in considering the validity of the contract, he uses the words "profession", "business", and "trade" interchangeably.

American cases decided before passage of the Sherman Act recognize and follow the reasoning of these English cases. See Cook v. Johnson, 47 Conn. 175, 36 Am.Rep. 64, which involved a dentist's contract. There the court said that it belonged to the class of contracts in restraint of trade. To the same effect, see Haldeman v. Simonton, 55 Iowa 144, 7 N.W. 493; Gilman v. Dwight, 13 Gray, Mass., 356, 359,

74 Am.Dec. 634. In the case last named the court said: "There is nothing in the nature of the business or profession to which the contract relates, which takes it out of the ordinary rules applicable to contracts in partial restraint of trade. The cases are numerous in the books, in which similar contracts entered into by attorneys, solicitors, apothecaries, dentists and surgeons have been upheld and enforced."

See also Dwight v. Hamilton, 113 Mass. 175, and Mandeville v. Harman, 42 N.J. Eq. 185, 7 A. 37. More modern cases are Webster v. Williams, 62 Ark. 101, 34 S.W. 537; Rakestraw v. Lanier, 104 Ga. 188, 30 S.E. 735, 69 Am.St.Rep. 154; Gordon v. Mansfield, 84 Mo.App. 367; State v. Calhoun, Mo.App., 231 S.W. 647; Greenfield v. Getman, 140 N.Y. 168, 35 N.E. 435; Hulen v. Earel, 13 Okl. 246, 73 P. 927; Turner v. Abbott, 116 Tenn. 718, 94 S.W. 64, 6 L.R.A.,N.S., 892, 8 Ann.Cas. 150; Randolph v. Graham, Tex.Civ.App., 254 S.W. 402; Erikson v. Hawley, 56 App. D.C. 268, 12 F.2d 491; and in Styles v. Lyon, 87 Conn. 23, 86 A. 564, 566, the court said: "The defendant insists there is a distinction between a business and a profession; that, while the period of restriction as to a business may be unlimited, the rule should not apply to a profession, since it is a purely personal relation whose benefits cease upon death or the cessation from practice. We do not think the distinction tenable. A profession partakes on its financial side of a commercial business, and its good will is often a valuable asset."

The indubitable effect of all these cases, English and American, is to enlarge the common acceptation of the word "trade" when embraced in the phrase "restraint of trade" to cover all occupations in which men are engaged for a livelihood. We think it makes no difference that, after the practice of medicine had been recognized as embraced in the doctrine of "restraint of trade", Davis v. Mason, supra, a number of judges preferred to speak in broader terms of "public policy" and the like, without using the word "trade".[3] The foundation of the rule in restraint of trade cases is the rule of public policy, and always was from Mitchel v. Reynolds, [1711] 1 P. Wms. 181, 24 Eng.Rep. 347, on down, without distinction based on type of occupation involved.

Perhaps the most illuminating of the English cases is Pratt v. British Medical Association, [1919] 1 K.B. 244. The case was a tort action to recover damages for molesting plaintiff doctors in the pursuit of their calling. The facts there and here are strikingly similar. The plaintiffs had joined the staff of an organization known as Coventry Provident Dispensary, which had fallen under the ban of the medical society because the members of the latter were opposed to what was called contract practice. The doctors who joined the staff of the organization were expelled from the society for violation of its rules of ethics and other members of the society were forbidden to consult with them on pain of expulsion. A "black list" was published in the British Medical Journal, and the court found that the effect was to boycott the plaintiffs in their practice, greatly to their injury, and likewise that the purpose of the boycott was to increase the area of practice and the financial returns of the members of the society. On this subject the court said (p. 272): "If the Coventry Dispensary had been destroyed as a lay organization, then the local doctors could obviously have taken such steps as would have increased their area of private practice, and their emoluments would have gained a corresponding expansion. This was the fundamental object of the defendants. The non-participation in such aim by the plaintiffs was the head and front of their offending."

3 McCurry v. Gibson, 108 Ala. 451, 18 So. 806, 54 Am.St.Rep. 177; Freudenthal v. Espey, 45 Colo. 488, 102 P. 280, 26 L.R.A.,N.S., 961; Linn v. Sigsbee, 67 Ill. 75; Ryan v. Hamilton, 205 Ill. 191, 68 N.E. 781; Storer v. Brock, 351 Ill. 643, 184 N.E. 868; Martin v. Murphy, 129 Ind. 464, 28 N.E. 1118; Proctor v. Hansel, 205 Iowa 542, 218 N.W. 255, 58 A.L.R. 153; Mills v. Ressler, 87 Kan. 549, 125 P. 58; Warfield v. Booth, 33 Md. 63; Granger v. Craven, 159 Minn. 296, 199 N.W. 10, 52 A.L.R. 1356; Thompson v. Means, 19 Miss. 604, 11 Smedes & M. 604; Tarry v. Johnston, 114 Neb. 496, 208 N.W. 615; Mott v. Mott, 11 Barb., N.Y., 127; Holbrook v. Waters, 9 How.Prac., N.Y., 335; Foster v. White, 248 App.Div. 451, 290 N.Y.S. 394; Threlkeld v. Steward, 24 Okl. 403, 103 P. 630, 138 Am.St.Rep. 888; McClurg's Appeal, 58 Pa. 51; French v. Parker, 16 R.I. 219, 14 A. 870, 27 Am. St.Rep. 733; Butler v. Burleson, 16 Vt. 176; Madson v. Johnson, 164 Wis. 612, 160 N.W. 1085.

And considering the validity of the action of the defendants and their right by means of their own rules or canons to impose a restraint upon non-conforming physicians, the court said (p. 274): "The public interest must be regarded conjointly with the interests of individuals when restraint of trade is in question. Recent illustrative decisions will be found in Neville v. Dominion of Canada News Co. (2) and Horwood v. Millar's Timber and Trading Co. (3) The doctrine of "restraint of trade" has been applied in many directions. The restraint may exist in a contract between two parties, or in rules purporting to bind many individuals. See, for example, Hilton v. Eckersley (4); Hornby v. Close (5); Old v. Robson (6); and Cullen v. Elwin. (7) Many decisions were considered in the well-known case of Russell v. Amalgamated Society of Carpenters and Joiners. (8) Upon considering the rules in question I have arrived at the conclusion that they are in restraint of trade, and are void on the ground of public policy. They gravely, and in my view unnecessarily, interfere with the freedom of medical men in the pursuit of their calling, and they are, I think, injurious to the interests of the community at large. It may well be that the opinion I have just expressed will, if upheld, destroy the cogency of the defendants' scheme of boycott; but it leaves them with the safer and more kindly weapons of legitimate persuasion and reasoned argument." [4]

The critical comments contained in Ware and De Freville, Ltd. v. Motor Trade Association, [1921] 3 K.B. 40, do not overrule or disapprove the basic doctrine of the Pratt case, and are directed solely at some of its language on matters not pertinent here.

We think enough has been said to demonstrate that the common law governing restraints of trade has not been confined, as defendants insist, to the field of commercial activity ordinarily defined as "trade", but embraces as well the field of the medical profession. And since, as we think, we are required by the decisions of the Supreme Court to look to the common law as the chart by which to determine the class and scope of offenses denounced in Sec. 3, it follows that we must hold that a restraint imposed upon the lawful practice of medicine,—and a fortiori—upon the operation of hospitals and of a lawful organization for the financing of medical services to its members, is just as much in restraint of trade as if it were directed against any other occupation or employment or business. And, of course, the fact that defendants are physicians and medical organizations is of no significance, for Sec. 3 prohibits "any person" from imposing the proscribed restraints. Congress did not provide that one class, any more than another, might impose restraints or that one class, any more than another, might be subjected to restraint.

This brings us, then, to consider whether the indictment shows unreasonable restraints.

The charge, stated in condensed form, is that the medical societies combined and conspired to prevent the successful operation of Group Health's plan, and the steps by which this was to be effectuated were as follows: (1) to impose restraints on physicians affiliated with Group Health by threat of expulsion or actual expulsion from the societies; (2) to deny them the essential professional contacts with other physicians; and (3) to use the coercive power of the societies to deprive them of hospital facilities for their patients. Sufficient facts are stated to demonstrate that, unchecked, this exertion of power will necessarily accomplish the abandonment of the co-operative plan of medical service, as well as destroy the livelihood of dissident doctors, because the general restraint thus applied would make impossible the continued operation of the one or the successful practice of medicine by the others.

Defendants say that what they are charged with doing amounts to no more than the regulation of membership in the society and the selection of the persons with whom they which to associate; that under their rules disobedient members may lawfully be disciplined and that disciplination does not amount to unreasonable restraint. This may very well be true, and in considering the contention we are not unmindful of the importance of rules of conduct in medical practice, rules which can best be made by the profession itself. We recognize, in common with an almost universal public opin-

---

**4** Footnote citations in the British report as follows:

(2) [1915] 3 K.B. 556.
(3) [1917] 1 K.B. 305.
(4) (1855) 6 E. & B. 47.
(5) (1867) L.R. 2 Q.B. 153.
(6) (1890) 62 L.T. 282.
(7) (1904) 90 L.T. 840.
(8) [1912] A.C. 421.

ion, that in the last half century, through this means, the quack and the charlatan have been largely deprived of the opportunity of preying on the unfortunate and the credulous. We also recognize that in personal conduct and in professional skill the rules and canons, so established, have aided in raising the standards of medical practice to the advantage of the whole country. We are mindful of a generally known fact that under these rules and standards there has developed an esprit de corps largely as a result of which the members of the profession contribute a considerable portion of their time to the relief of the unfortunate and the destitute. All of which may well be acknowledged to their credit. Notwithstanding these important considerations, it cannot be admitted that the medical profession may through its great medical societies, either by rule or disciplinary proceedings, legally effectuate restraints as far reaching as those now charged. "An act harmless when done by one may become a public wrong when done by many acting in concert, for it then takes on the form of a conspiracy, and may be prohibited or punished, if the result be hurtful to the public or to the individual" against whom it is directed. Eastern States Retail Lumber Dealers Ass'n v. United States, 234 U.S. 600, at page 614, 34 S.Ct. 951, 58 L.Ed. 1490, L. R.A.1915A, 788. If there is any justification for the restraint, so as to make it reasonable as a regulation of professional practice, it must be shown in evidence as a defense, since it does not appear in the indictment.

Restraints prohibited by Sec. 3 of the Sherman Act are those which unduly hinder a person from employing his talents, industry, or capital in any lawful undertaking and thus keep the public from receiving goods and services as freely as it would without such restraints. Enough has been said to show that the restraint here charged would restrict the common liberty of Group Health, the doctors, and the hospitals from engaging in the pursuit of their respective functions. If on the trial the charge of confederation to this end is sustained, defendants' method of reaching their objective may be thereby defeated, but if the objective is wise—as they insist—they still have left, as was said by the English judge in the Pratt case, the safer and more kindly weapons of legitimate persuasion and reasoned argument. In the proper use of these, much, as we think, may be accomplished to avoid the growing movement toward professional regimentation. Or, this opportunity neglected, members of the medical associations in the District of Columbia perhaps may find in Sec. 3, as we construe it, their only protection in the right to practice on a fee for service basis.

In the light of what has been said, we consider the numerous cases involving the reasonable operations of trade associations and trade unions as inapplicable. Organizations and rules which have as their purpose the improvement of conditions in any particular trade or occupation, and the regulation of relations between traders, are, as we have just pointed out, beneficial rather than detrimental to the public interest. But when these same organizations go so far as to impose unreasonable restraints on the operations in their field, they become subject to the prohibition of the Sherman Act. Sugar Institute v. United States, 297 U.S. 553, 597-600, 56 S.Ct. 629, 80 L.Ed. 859.

Appellees rely on the following state court decisions: Harris v. Thomas, Tex.Civ. App., 217 S.W. 1068; Porter v. King County Medical Society, 186 Wash. 410, 58 P.2d 367; Irwin v. Lorio, 169 La. 1090, 126 So. 669; Weyrens v. Scotts Bluff County Medical Society, 133 Neb. 814, 277 N.W. 378; Strauss v. Marlboro County Hospital, 185 S.C. 425, 194 S.E. 65; Newton v. Board of Commissioners, 86 Colo. 446, 282 P. 1068; McDonald v. Massachusetts General Hospital, 120 Mass. 432, 21 Am.Rep. 529; Branagan v. Buckman, 67 Misc. 242, 122 N.Y.S. 610; and Olander v. Johnson, 258 Ill.App. 89. They insist these cases sustain the view that disciplinary action taken against one of their number by an association of physicians pursuant to its canons of ethics is permissible and does not violate the common rights either of the individual or of the public. We have examined these cases and are of opinion that, with the exception of the Porter and Weyrens cases, none is apposite. Those two cases do tend to sustain the actions of medical societies in their attempt to control the scale of medical fees, but in so far as they hold such action to be lawful and deny any right to the injured individual to obtain redress, we cannot accept them as binding or even persuasive authority in the decision of what is or is not lawful under the Sherman Act. The doctrine of restraint of trade was not involved in either case. In the Weyrens case, an expelled physician asked a court to order his

reinstatement in his medical society, before he had exhausted his remedies within the organization. In the Porter case, a layman lost his job because defendants had induced his employers to close their business. The lawfulness of the inducements was considered solely in the light of what a society might do with respect to its membership, and selfish motives were deemed immaterial. In our view, the Sherman Act must be applied with respect to public interests, and this raises broader issues than these two cases contain.

At the risk of tedious repetition, we repeat that the charge made here, and for the purposes of the demurrer admitted, is that the societies sought to restrain an association of persons of modest means from receiving medical services at lower cost and to coerce doctors and hospitals to this end. The charge may be wholly unwarranted and the facts, when they are disclosed on the trial, may show an entirely different state of affairs, but for present purposes we must take the charge as though its verity were established; and in that light, it seems to us clear that the offense is within the condemnation of the statute. It certainly cannot be doubted that Congress intended to exert its full power, in the public interest, to set free from unreasonable obstruction the exercise of those rights and privileges which are a part of our constitutional inheritance, and these include immunity from compulsory work at the will of another, the right to choose an occupation, the right to engage in any lawful calling for which one has the requisite capacity, skill, material, or capital, and thereafter the free enjoyment of the fruits of one's labors. Congress undoubtedly legislated on the common law principle that every person has individually, and that the public has collectively, a right to require the course of all legitimate occupations in the District of Columbia to be free from unreasonable obstructions; and likewise in recognition of the fact that all trades, businesses and professions, which prevent idleness and exercise men in labor and employment for the benefit of themselves and their families and for the increase of their substance, are desirable in the public good and any undue restraint upon them is wrong and is immediate and unreasonable and, therefore, within the purview of the Sherman Act. For illustrations of this principle, see Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.

Ed. 488, 13 Ann.Cas. 815; Eastern States Lumber Dealers Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A. 1915A, 788; Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341; Duplex Printing Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Bedford Cut Stone Company v. Stone Cutters Association, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Montague v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; United States v. Brims, 272 U.S. 549, 47 S. Ct. 169, 71 L.Ed. 403.

In the Eastern States case, an association of retail lumber dealers, in a desire to protect their local retail trade against competition by wholesalers selling to consumers within local territory, agreed to report any information received by anyone of them showing such sales by any wholesaler. This information when obtained was sent to the secretary of the association and if, upon investigation by a board, it was found to be true, the name of the wholesaler was placed on a list distributed among all the members. The purpose was to induce all retailers who received the list to withhold patronage from the offender. The Supreme Court held that the circulation of the list was in unreasonable restraint of commerce, since it influenced retailers with no personal grievance to cease trading with the offender. "* * * the trade of the wholesaler with strangers was directly affected, not because of any supposed wrong which he had done to them, but because of the grievance of a member of one of the associations, who had reported a wrong to himself, which grievance when brought to the attention of others it was hoped would deter them from dealing with the offending party."

This practice, the Court said, brought the act within the prohibited class of undue and unreasonable restraints. If what was proved there was unreasonable, what is charged here is so in a larger degree, since the effect in the present case on the activity to be restrained is more serious as well as more far reaching.

Defendants contend as a subsidiary argument that, without regard to whether the restraint would or would not be an illegal act ordinarily it is not so in the present instance for the reason that Group Health as a corporation is itself illegally practicing medicine. The United States District Court decided to the contrary some time ago, in a

714

suit for declaratory judgment.[5] There was no appeal, and the question, so far as we are concerned, may be said to be open. On this demurrer it is unnecessary, and indeed undesirable, that we should pass upon it except to decide whether, as described in the indictment, Group Health is necessarily violating the law.

■ The practice of medicine in the District of Columbia is subject to licensing and regulation and, we think, may not lawfully be subjected "to commercialization or exploitation". As was well said in People v. United Medical Service, 362 Ill. 442, 200 N. E. 157, 163, 103 A.L.R. 1229, the practice of medicine requires something more than the financial ability to hire competent persons to do the actual work. And so it has been held under varying conditions, speaking generally, that where a corporation operates a clinic or hospital, employs licensed physicians and surgeons to treat patients, and itself receives the fee, the corporation is unlawfully engaged in the practice of medicine. This is true because it has been universally held that a corporation as such lacks the qualifications necessary for a license, and without a license, its activities become illegal.[6] It has also been said that the relationship of doctor and patient, well recognized in the law, would be destroyed by such an arrangement. On the other hand, some courts have drawn a distinction between practicing medicine and merely furnishing medical services.[7]

■ But in all the cases we have examined in which the practice has been condemned, the profit object of the offending corporation has been shown to be its main purpose, and in no case were the circumstances precisely like those described in the indictment, i. e., a non-profit organization, conducted so that the proper doctor and patient relationship is preserved; prospective patients organized only for the purpose of providing a clinic and paying doctors and hospital service out of members' dues; a plan designed not to interfere with the doctor's loyalty to his patient so as to commercialize medicine in a way contrary to the best interests of patient or practice, or to subject the physician to the corporation's control and make his practice a corporate act. As thus described, it is no more than a group of persons, under corporate organization, contributing stated sums of money monthly for the payment of prospective medical services to the extent they may be required. In these respects, it differs from the medicine-practicing corporations which, in many of the States have been held to be illegal. Without more, therefore, than now appears, we are unable to say that Group Health is illegally practicing medicine.

We come finally to the question whether the indictment is sufficient in form. The learned trial judge was of opinion it was not. He thought the indictment afflicted with vague and uncertain statements and

5 Group Health Ass'n, Inc. v. Moor, D. C., 24 F.Supp. 445.

6 Cases holding that a corporation was practicing medicine, or dentistry, or surgery illegally are:
McMurdo v. Getter, Mass., 10 N.E.2d 139 (employer was vendor of eye glasses prescribed by doctor);
Pacific Insurance Co. v. Carpenter, 10 Cal.App.2d 592, 52 P.2d 992 (employer was in the insurance business, making money out of premium profits);
State v. Boston System Dentists, Ind. Sup., 19 N.E.2d 949 (employer was a corporation authorized to engage in practicing dentistry and the salaried dentists were its servants for hire);
Winslow v. Kansas State Board, 115 Kan. 450, 223 P. 308 (employer incorporated for the purpose of maintaining dental quarters, furnishing services of dentist, and selling dental equipment);
State v. Bailey Dental Co., 211 Iowa 781, 234 N.W. 260 (corporation maintaining dental offices);

People ex rel. Lederman v. Warden of City Prison, 168 App.Div. 240, 152 N.Y. S. 977 (drug store employed physician to give free medical attention to its customers);
People v. Painless Parker Dentist, 85 Colo. 304, 275 P. 928 (corporation furnishing dental services through its employee for its profit);
People v. United Medical Service, 362 Ill. 442, 200 N.E. 157, 103 A.L.R. 1229 (corporation furnishing medical service on a flat fee to customers for its own profit).
See also Hannon v. Siegel-Cooper Co., 167 N.Y. 244, 60 N.E. 597, 52 L.R.A. 429; cf. In re Co-operative Law Co., 198 N.Y. 479, 92 N.E. 15, 32 L.R.A.,N.S., 55, 139 Am.St.Rep. 839, 19 Ann.Cas. 879.
7 State Electro-Medical Institute v. State, 74 Neb. 40, 103 N.W. 1078, 12 Ann.Cas. 673; State Electro-Medical Institute v. Platner, 74 Neb. 23, 103 N.W. 1079, 121 Am.St.Rep. 706; State ex inf. Sager v. Lewin, 128 Mo.App. 149, 106 S.W. 581.

lacking in material facts. On the argument in this Court, appellees' contentions may be summarized as follows: that the indictment is generally indefinite, full of conclusions and opinions, and does not set out the offense with particularity; the allegations as to the background of the conspiracy and the power of the medical organizations are irrelevant; the character of Group Health and the business of the Washington hospitals are not properly shown; there is a variance between the risk sharing plans described in the background of the conspiracy and the description of the activities of Group Health; the averments as to the principles of medical ethics and the operation of the societies are insufficiently stated; there are no facts stated as to restraints on hospitals; the averment as to dates is insufficient; and there is no charge against the individual defendants.

We shall consider briefly these points.

■■ It has been stated time and again as a fundamental rule that in an indictment all the essential elements of the offense must be averred with sufficient clearness and particularity to enable the accused to understand the nature of the charge against him and enable him intelligently to prepare to meet it, and to plead the result, whether conviction or acquittal, as his protection against another prosecution for the same offense. But the degree of particularity requisite to accomplish these purposes is all that is required. As we said in Beard v. United States, 65 App.D.C. 231, 234, 82 F.2d 837, 840:

"R.S. § 1025 [8] was enacted for the purpose of preventing miscarriage of justice through the application of technical rules in relation to matters of form in indictments, and it is now universally held, that the sufficiency of a criminal pleading is to be determined by practical, rather than technical, considerations. Or, as the Supreme Court said, the rigor of the old common-law rules has yielded in modern practice to the general principle that formal defects not prejudicial will be disregarded. Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861."

In Nash v. United States, 229 U.S. 373, 378, 33 S.Ct. 780, 57 L.Ed. 1232, it was held that no overt acts need be charged in an indictment under the Sherman Act, and the cases under the Act show that the indictments usually set out the organization of defendants, the extent of their control over the trade, their relations with each other, and the means whereby they conspired to perpetrate the restraint.[9] The indictment at hand contains these averments. It charges that all the defendants have engaged in a combination and conspiracy in restraint of trade. It sets out the place of the conspiracy and the plans of the conspirators and the means taken to make them effective. The restraint was to be imposed on Group Health, on physicians, and on Washington hospitals, and it is specifically stated that the conspiracy was to prevent doctors of Group Health from treating and operating on patients in the hospitals within the District of Columbia. The preamble to the resolution adopted by District Society, to which we have already referred, declares the society's apparent power of hindering Group Health if it can prevent patients of physicians in the employ of Group Health being received in the hospitals, and the indictment charges the subsequent circulation among the hospitals of the white list as the means to this end. This is a sufficient charge of a conspiracy to restrain the business of Group Health, the doctors, and the hospitals.

■ The "background" of the conspiracy as described in the indictment cannot, under any circumstances we can think of, be considered as prejudicial, and its relevancy, we think, is established by the opinion of the Supreme Court in Chicago

---

[8] 18 U.S.C.A. § 556.

[9] United States v. Patten, 226 U.S. 525, 536–539, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325; United States v. Pacific & Arctic Ry. & Nav. Co., 228 U.S. 87, 88–94, 33 S.Ct. 443, 57 L.Ed. 742; Knauer v. United States, 8 Cir., 237 F. 8; United States v. Rintelen, D. C., 233 F. 793; United States v. New Departure Mfg. Co., D.C., 204 F. 107, 109, 110; United States v. Patterson, D. C., 201 F. 697, 699–701, rev'd on other grounds but affirmed as to first count of indictment, 6 Cir., 222 F. 599, certiorari denied 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499; Steers v. United States, 6 Cir., 192 F. 1, 6, 7; United States v. Swift, D.C., 188 F. 92; United States v. American Naval Stores, C.C., 186 F. 592, reversed on other grounds but affirmed as to indictment, Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232; United States v. MacAndrews & Forbes, C.C., 149 F. 823, 825–829; United States v. National Malleable & Steel Castings Co., D.C., 6 F.2d 40, 41; 3 Zoline's Fed.Crim.Proc. 40, 54.

Board of Trade v. United States, 246 U.S. 231, at page 238, 38 S.Ct. 242, 62 L.Ed. 683.

■ Allegations as to the power of the medical organizations are not irrelevant. They give to the conspiracy a significance in regard to restraining the practice of medicine, which it might not otherwise have, and are similar to allegations, in other indictments, of the control over a large amount of a particular trade.

■ The point that Group Health is not sufficiently described is answered in the paragraph of the indictment which sets out its incorporation, its purpose, its character, its activities, and its relationship to its members.

■ The alleged variance between the risk sharing plans described in the "background", which it is charged the American Medical Association habitually opposed, and the plan of Group Health, seems to us immaterial. The obvious purpose of the indictment is to charge that all risk sharing plans have been opposed and that the present restraint is merely another attack.

■ We think it was unnecessary to set out any more detailed facts as to the contents of the Principles of Medical Ethics and the operations of committees and society meetings. Cf. Mercer v. United States, 3 Cir., 61 F.2d 97, 98, 99. It is enough to charge the conspiracy and the means used to effect the unlawful restraints. Overt acts are unnecessary. Nash v. United States, supra.

■ There is a sufficient allegation of dates. The indictment, it is true, states the beginning of the conspiracy shortly prior to the incorporation of Group Health, but it also shows that it continued to the date of the presentation of the indictment. That is enough.

■ The final point is that there is no definite charge against the individual defendants. The indictment in the opening paragraph names the associations and persons made defendants. The individuals are stated as the persons "who will be referred to hereinafter as 'individual defendants' ", and they are thereafter described in the succeeding paragraphs as members or officers in the societies and members in or officers of the hospitals or members on the staffs of the hospitals; and it is clear that their activities in the conspiracy are charged as done in their several stated capacities. All are charged with participa-

tion in the formation and furtherance of the conspiracy.

■ In view of the foregoing, we have no doubt that, reading the indictment as a whole, it states a case under Sec. 3 of the Sherman Act.

Reversed and remanded.