**UNITED STATES v. WESTERN UNION TELEGRAPH CO. et al.**

District Court, S. D. New York.

Sept. 16, 1943.

John T. Cahill, U. S. Atty., of New York City (Robert M. Cooper, Sp. Asst. to the Atty. Gen., M. H. Brass, Sp. Atty., of Washington, D. C., and William L. Lynch, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Francis R. Stark and Ralph H. Kimball, both of New York City, for defendants.

NEVIN, District Judge (sitting by designation).

This is a proceeding in equity, commenced by the filing of a petition under the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, seeking injunctive relief against the enforcement of certain exclusive contracts entered into by the defendants and various other parties and to restrain the defendants from executing any similar contracts in the future. The defendants are the Western Union Telegraph Company, Newcomb Carlton, Chairman of the Board of Directors, J. C. Willever, Vice President in charge of the Commercial Department, and Lewis McKisick, Secretary, all officers of the defendant company.

The contracts here involved consist of several different types. There are those executed between the defendant company and many railroads, covering approximately 200,000 miles of an existing 260,000 miles of railroad rights of way in the United States. Others are with numerous railroad, terminal, and other transportation companies throughout the United States which grant rights of exclusive occupancy to the defendant company, the companies agreeing not to permit any other telegraph company to establish an office or transact a public telegraph business on the premises, and still others exist between the defendants and the owners of hotels, clubs, and other business buildings frequented by the public in substantial numbers, in which the owners agree not to permit any other telegraph company to establish or operate a station in the building for the transaction of a public telegraph business.

The petition[1] states three charges under Sections 1 and 2 of the Sherman Anti-Trust

---

[1] The petition was filed on December 1, 1937. Preliminary matters having intervened and been disposed of, the cause came on for trial on January 16, 1941. It was not finally submitted, however, until May 23, 1941.

After its submission legislation was proposed in Congress permitting the consolidation and merger of domestic telegraph carriers and it was stated in the newspapers that the President of the United States favored such merger in the interest of the war effort.

Because of this, a conference was held, attended by the court and counsel for the respective parties, with a view to determining what further should be done in the instant case, if anything. At that time counsel for the Government expressed some doubt as to the proposed legislation being enacted. Subsequently, however, it was enacted and signed by the President and on May 13, 1943, a contract was signed between Western Union and Postal agreeing on a plan for merger.

In view of the proposed and pending legislation—and after conference with counsel—a decision in this cause was postponed. After the enactment of the legislation, to-wit, on May 11, 1943, (two days before the signing of the Agreement above referred to) a further conference was held by the court and counsel. The transcript of the minutes of that conference shows the following:

"The Court: Let the record show that on this date, May 11, 1943, at two o'clock p. m., pursuant to correspondence heretofore had between the various counsel present and the Court, a conference was held in the United States Court House in New York City, the main purpose of which was to determine whether or not, in view of the present status of the merger legislation and the things that are being done thereunder by the Western Union Telegraph Company and the Postal Telegraph Company, it is expedient and proper for the Court to decide the case of United States v. Western Union Telegraph Company, et al., Equity No. 86-129, or whether a decision in the case should be held in abeyance until some future time, with the possibility that it might not be necessary or even essential to decide the case at all. After conference and consultation between all the parties and the Court, it appears that the Government, represented by Miss

Act, c. 647, 26 Stat. 209, c. 690, 50 Stat. 693. First, it charges a conspiracy among the officers of the company and the company to restrain trade and commerce in interstate telegraph communication; second, it charges the execution and enforcement of contracts in restraint of trade and commerce; and third, it charges the defendants with an attempt to monopolize interstate trade and commerce in telegraph communication.

The answer of the defendants generally admits the execution and enforcement of the contracts described, but denies that their effect is to restrain interstate trade and commerce in telegraph communication.

The answer alleges that the total traffic involved in all the matters to which the petition relates is an insignificant fraction of the telegraph traffic of the United States, and the contracts consequently cannot constitute an unlawful attempt to monopolize the industry or unreasonably to restrain commerce; that the present position of the exclusive-occupancy relationships is not the

---

Brass, Special Attorney, Department of Justice, and Mr. Lynch, Assistant United States Attorney, is of the opinion that the Court should proceed with reasonable dispatch to decide the case. It is the view of Mr. Stark, representing the Western Union Telegraph Company and other defendants, that the Court might well wait at least until further steps have been taken in the merger proceedings with a view to deciding whether the case should finally be determined or not. Miss Brass states that it is the view of the Department of Justice, however, that even though the merger should become an accomplished fact, nevertheless the Government desires this case decided by the Court because of the possibility of some similar situation arising in the years to come with some other telegraph company or similar organization. Miss Brass, does what I have dictated to the reporter cover your views and did I properly state the expression of the Government?

"Miss Brass: Yes, that is right.

"The Court: Mr. Lynch, that expresses your views, too?

Mr. Lynch: It expresses the views of the Government.

"The Court: And, Mr. Stark, have I correctly stated your views?

"Mr. Stark: Yes, sir. * * *

"The Court: * * * I would like to have the record show what I have already mentioned, that I was prompted in doing this, having this conference and holding the matter off, because it was my impression, perhaps an erroneous impression, but it was my impression, that at the last conference we had the thought was there would not likely be a merger and, therefore, I might just as well go ahead and decide the case. Subsequently I heard from Mr. Stark and through the public press that this enabling legislation had been passed, and I had already seen in the papers that the President thought this merger should take place as part of the war effort. I did not want to do anything that I thought

would in any way interfere with that, and I say that without presuming, or meaning to presume, that a decision by this court would in any way interfere with it. I just thought I should have the expression of counsel, but I think we all understand alike now. * * *

"Miss Brass: Of course, there is still the possibility the thing may not go through; there may never be a merger.

"Mr. Stark: That is possible.

"Miss Brass: And it could be, if the merger does go through very shortly, as you seem to think it will, that after it is in operation, we might see how it operates. Maybe, if the case is decided, they will not take that position, but we do feel now, regardless of whether or not we have a merger, we would like to have it decided.

"The Court: And would you state what you stated a while ago, if I understood it correctly, that even if the merger became accomplished, you would still want the case decided, the Government would, because you felt there might be new companies in the future, or something of the kind?

"Miss Brass: Yes.

"The Court: What was that statement? Would you put that in the record please?

"Miss Brass: All right. Even if there is a merger at some time in the future, the Department would like to have the case decided because the act permitting the merger provides that new companies may come into the telegraph field upon receiving a certificate of convenience and necessity from the Federal Communications Commission. The act also provides that the International telegraph companies may have feeder lines at various cities' throughout the United States for the purpose of receiving and transmitting messages by international telegraph. For this reason, the field should be kept open so that the facilities needed by the international telegraph companies would be available."

result of any combination to divert commerce from its normal channels, but of the gradual and natural growth of the telegraph business along historical lines, and that there has been no contract, combination or concerted action within the meaning of the law.

The answer further alleges that there is a lack of indispensable parties in this proceeding, brought about by the failure of the Government to join the other parties to these contracts, whose rights, it is alleged, would be adversely affected by a decree such as the Government seeks.

At the outset of the trial (Rec. Pp. 9, 32) defendants made a "motion to dismiss the petition for want of indispensable parties." In the course of the argument on the motion, counsel for the Government stated (Rec. Pp. 36–37): "Now on the question of the relief the Government asks, the Government requests nothing except an injunction against the defendants, and it asks for nothing more. * * * The Government asks for no relief whatsoever except against these defendants that are before this Court."

As shown by the record (P. 67 et seq.) and for the reasons there stated, a ruling on the foregoing motion to dismiss was held in abeyance and it was agreed that the trial should proceed with the understanding that the court either would pass on the motion independently at a later time or do so when the case was decided on the merits. The court has adopted the latter course.

■ Upon a consideration of the motion and the arguments of counsel the court is of opinion, and so finds, that the motion is not well taken and that it should be, and here and now it is, overruled.

We come then to a consideration of the case as presented on the record.

It is the contention of the Government that the execution and enforcement of the exclusive contractual agreements herein involved constitute a substantial restraint on interstate telegraph communication and seriously handicap competitors of the defendant company in their effort to gain access to those areas and points at which the telegraph business tends to concentrate.

The Government does not contend that any one of the contracts standing by itself is illegal, but that when all are taken together they form or tend to form a monopoly in violation of the law. As to this, the record (Pp. 325–327) shows as follows:

"Mr. Cooper: (of counsel for the Government) The Government's claim amounts to this: that the many very very desirable buildings, from the standpoint of the telegraph business, are completely exclusive so far as a competitor is concerned. Now I may illustrate that in this fashion: take a large office building which Western Union has tied up by an exclusive contract. There are many thousands of dollars annually in telegraph revenue in that building that Postal cannot touch.

"The court: Now why? Is that because of the exclusive contract with the building?

"Mr. Cooper: Right.

"The Court: All right. Now what is your claim as to the illegality of that?

"Mr. Cooper: Of course the one contract in and of itself would not be illegal, probably, but here there are literally thousands of them, and the whole system must be viewed as a whole; the railroad contracts, the terminal contracts, and the building contracts and the hotel contracts.

"The Court: Then it is your claim, as I understand it, that this is just one of the cogs in the machine; that is just one item to be taken into consideration in considering the whole combination.

"Mr. Cooper: That is right; yes sir.

"The Court: But it is not your claim or is it, that this thing, in and of itself, is a matter that would be intrinsically illegal and wrong?

"Mr. Cooper: That is not the position of the Government."

The Government concedes that as domestic telegraph carriers or in the field of communications sent by telegraph, the only competitor of defendant company, insofar as it concerns this case, is Postal Telegraph, Inc., and that there is no charge of conspiracy between these two companies. Counsel for the Government stated (Rec. P. 5):

"The Government intends to establish that the execution and enforcement of these exclusive arrangements has seriously handicapped the competitors of the defendant company in their effort to gain access to those areas and points at which the telegraph business is available.

"The Court: Who are the competitors, outside of the Postal?

"Mr. Cooper: That is practically the principal competitor. There is nothing else in this picture that seems to enter into it except the Postal Company. * * * They did not charge conspiracy between the companies."

Defendants submit that the "case involves a single and simple question of law. That question is whether there is anything wrong under the Sherman Anti-Trust Act about contracts between telegraph companies and the owners of land whereby the telegraph company acquires the right to maintain lines and establish offices, with the stipulation that while the lines and offices are there similar privileges will not be granted in the same building or premises to a competing telegraph company."

Defendants claim that the three charges made in the petition are in effect but one charge and they assert that "defendants are not charged with having restrained or attempted to restrain commerce, or with attempting to monopolize commerce, otherwise than by attempting to obtain and obtaining the exclusive contracts described, and the defendants are not charged with any combination or conspiracy, or with any attempt, to monopolize, except in pursuance of the said combination and conspiracy.

The Government's case stands or falls on the question whether the contracts, singly or in the aggregate, constitute a violation of the Sherman Act. Section 3 of the Clayton Act, 15 U.S.C.A. § 14, prohibiting certain restrictions in connection with the sale or lease of tangible property, the source of so many of the decisions on which the Government usually relies in anti-trust cases, does not apply and is not invoked. The Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., does not apply to telegraph companies and is not invoked. The question arises under the Sherman Act alone, and the issues are these: (1) Whether the contracts are unlawful restraints of trade under Section 1. (2) Whether, if not, defendants can be held to have unlawfully monopolized or attempted to monopolize commerce under Section 2 by means of a series of such contracts any of which separately would concededly be lawful."

Defendants further assert that the Post Roads Act, c. 230, 14 Stat. 221, does not affect the questions here presented, nor prohibit the contracts here involved. With all of the foregoing claims of defendants, the court agrees.

In this connection, as pointed out by defendants, it is to be noted that the contracts here involved are not between competitors, or even between persons in the same line of business who might potentially become competitors, but between lessors or licensors in another line of business and the telegraph company as lessee or licensee.

A multitude of authorities have been cited and discussed by counsel on both sides, in their thorough and exhaustive briefs. They cover substantially all the decisions, especially by the higher courts, construing the Sherman Act—and many others. Some are decisions under the Post Roads Act. Some are decisions involving common law principles for, say counsel for the Government (R.Br.P. 14): "In construing the prohibitions of the Sherman Act it is necessary to consider not only the decisions under that Act but also the principles and decisions of the common law which form the background of the Sherman Act, and the statutes which have as their ultimate aim a related or similar purpose."

Among the authorities cited and stressed by the Government—and in some instances by the defendants as well—are the following: United States v. Terminal Railroad Association of St. Louis, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810; Shawnee Compress Co. v. Anderson, 209 U.S. 423, 425, 28 S.Ct. 572, 52 L.Ed. 865; United States v. Pacific & Arctic Co., 228 U.S. 87, 33 S. Ct. 443, 57 L.Ed. 742; International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (suit under Clayton Act); United States v. Trans-Missouri Freight Association, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; United States v. Eastman Kodak Co., D.C., 226 F. 62; United States Telephone Co. v. Central Union Tel. Co., 6 Cir., 202 F. 66; United States v. Great Lakes Towing Co., D.C., 208 F. 733; United States v. American Medical Association, 72 App.D.C. 12, 110 F.2d 703; Vitagraph, Inc., v. Perelman, 3 Cir., 95 F.2d 142.

Defendants among their numerous citations call particular attention to the statements made by the Supreme Court in the comparatively late cases of Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, and Fashion Guild v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949. It, too, relies to some extent, on United States v. Trans-Missouri Freight

Association, supra, especially upon the views expressed by the Court on pages 328, 329, of 166 U.S., 17 S.Ct. 540, 41 L.Ed. 1007, reaffirmed (as defendants claim) in United States v. Joint Traffic Association, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259.

For the court here to attempt to analyze the many decisions referred to would serve no useful purpose and would extend this decision beyond all reasonable bounds. It is sufficient that the court has read and considered them and their relative importance insofar as they bear upon the issues involved in this case—for, in the final analysis this cause must be decided upon its own facts and upon the record here presented. In his oral argument counsel for the Government stated, "Now, of course, I recognize that none of these cases are on all-fours with the instant case. No two anti-trust cases are ever the same. They involve different competitive conditions, they involve different methods of doing business; but the thing that should be recognized in these cases is that the courts are categorical in their condemnation of any exclusive feature contracts which have the effect of eliminating competitors from doing a business on an equal basis in a free mart."

In a consideration of the instant case the nature and history of the business in which the defendant company is engaged must not be lost sight of. As to this Mr. White, (President of Western Union) testified (Rec. P. 446 et seq.): " * * * The telegraph business is peculiar in this respect, if not in many others: you cannot enter into the telegraph business in one place. You have to be in more than one place. If you are going to give the service that these large offices require, or that the patrons require, the public require, you must necessarily reach the place that they want to reach, and these little places all over the country cannot be thought of entirely from the standpoint of what business they take in. They have to be thought of also in the light of what business they distribute, what business they handle for the people in their immediate vicinity. And the fact that the company can provide that kind of distribution makes the larger office more or less possible. * * * the little office does not do a great deal of business, and many of them do very little, but if you set up to do a nationwide service and expect to do a nationwide service, the coverage is something that has to be con-

sidered. * * * Certainly the country west of the Alleghenies, and more particularly west of the Mississippi developed along the railroads, and the telegraph grew along with the railroads, and the telegraph was in many of these localities long before the locality was much itself. It was the only means of communication at that time, that is fast communication, and there would have been no way, that I can think of, where these communities or the nation or the country would have been served had they not had some arrangement similar to the one that the railroads now have, because there was no other way that they could have economically justified them. It was a natural partnership, it was a natural growth, one fitted into the other's picture, and it has remained that way from the very beginning."

It is conceded that if it had not been for their railroad contracts the defendant company would have been unable to provide telegraph service to the many thousands of small places throughout the United States which could not support an independent telegraph office and that these small communities must be served if it is desired to furnish an adequate telegraph service.

In this case the Government's complaint is premised on the number of contracts— each of which in itself is concededly lawful. At least the legality of the contracts, considered separately is not challenged, it being the Government's contention that even if the contracts standing alone are legal, the exclusive features are unlawful because they were executed in furtherance of a conspiracy to restrain trade in, and an attempt to monopolize the business of, interstate communication by telegraph.

The court is asked to infer an unlawful intent because of the number of contracts—"the whole system" (Rec. P. 326). This, upon the present record and considering the nature of the business in which the defendant company is engaged and of the contracts involved and their historical background as shown by the evidence, the court is unable to do.

The elements which make contracts, otherwise lawful, sometimes illegal as being "in restraint of trade" as set forth by the Supreme Court in Apex Hosiery Co. v. Leader, 310 U.S. 469, at page 497, 60 S.Ct. 982, 994, 84 L.Ed. 1311, 128 A.L.R. 1044, are not present in the instant case—and in so concluding the court has not been un-

mindful of the "distinction existing between enterprises inherently public in their character and those of a private nature" as pointed out by the Supreme Court in the Trans-Missouri Freight case, supra, at page 336 of 166 U.S.., at page 557 of 17 S.Ct., 41 L.Ed. 1007, nor of the further fact that it has been held that telegraph companies "are to be deemed public service corporations, affected by a public interest." Central New York Telephone & Telegraph Co. v. Averill, 199 N.Y. 128, 135, 92 N.E. 206, 208, 32 L.R.A.,N.S., 494, 139 Am.St.Rep. 878.

Upon a consideration of the whole of the record, the briefs and arguments of counsel and the applicable law, the court has arrived at the following:

### Findings of Fact

1. The United States of America instituted these proceedings pursuant to the Act of Congress of July 2, 1890, entitled "an act to protect trade and commerce against unlawful restraints and monopolies", to enjoin the defendant company and its officers from alleged violations of the Sherman Act.

2. The defendant company is a corporation organized and existing under and by virtue of the laws of the State of New York and has its principal place of business in the City and State of New York. It was organized in 1851 as the New York and Mississippi Valley Printing Telegraph Company, its name being changed in 1856 to the Western Union Telegraph Company (hereinafter sometimes referred to as Western Union.)

3. The defendant Newcomb Carlton was President from 1913 to 1933 and is now Chairman of the Board of Directors of the defendant company. The defendant J. C. Willever is first Vice-President in charge of the Commercial Department of the defendant company and a member of the Board of Directors. The defendant Lewis McKisick was secretary of the defendant company at the time this suit was brought and was a member of the Board of Directors.

4. The business of the Western Union is that of the transmission and reception of messages for the public at large by telegraph communication. Such telegraphic services originate or terminate in every State of the United States and extend to every important city and town in the United States; either by means of its own lines or by facilities leased from other telegraph companies or otherwise controlled by Western Union. Telegraphic messages originating in any State of the United States may be, and are, regularly transmitted over the lines of Western Union to destinations in each of the other States of the United States. In the transmission of messages and the performance of services connected therewith, the defendant company has been and is now engaged in interstate trade and commerce by telegraphic communication. This interstate trade and commerce is carried on in part within the Southern District of New York.

5. The other principal company which engages in a domestic public telegraph business is the Postal Telegraph, Inc. (Postal Telegraph-Cable Company) which was organized in 1883 (hereinafter referred to as Postal.)

6. The domestic telegraph service is divided between the defendant company and the Postal Company in the ratio of 80% and 20%. This ratio has not varied substantially since 1900.

7. The telegraph system as presently operated by the Western Union was built up as the result of gradual consolidation, by various forms of purchase, merger and lease, of over 500 smaller telegraph companies. The consolidation into the system as it exists at present was completed about the year 1882—one year before Postal was organized.

8. This process of consolidation enabled the company to render a nationwide, integrated telegraph service, enabling messages to be carried, without the interruption in time and expense of transfer to other companies, from practically every city, town and hamlet in the United States to every other city, town and hamlet in the United States. There is nothing in the record to show that this was other than a normal building up and extension of a public facility of a nationwide coverage which was in the interest of the public. It was completed under sanction of the laws of New York under which the Company was incorporated and prior to the passage of the anti-trust laws.

9. In certain respects the business of a railroad and the business of a telegraph company are naturally complementary. This had led, from the earliest days of the telegraph business, to the working out of elaborate relationships for the use of one another's facilities between a railroad com-

pany and some particular telegraph company.

10. For railroad operation it is essential that a railroad company have a pole line and at least one wire wherever it operates trains—on the small and unimportant branches as well as on the principal branches and trunk lines. Thus the railroad must either provide its own telegraph line for every mile of its system and maintain and repair it, or contract with some telegraph company to provide, repair and maintain a telegraph line for it. On the other hand a telegraph company to give national coverage over its own lines needs to have a pole line and wires between the towns, large and small, through which the railroad operates.

11. If the railroad company were obligated to provide its own line of telegraph, and the telegraph company required to parallel it by constructing another line along the highway, there would be an unnecessary duplication of capital investment, on which the public would ultimately be required in some form to pay a return. If on the contrary a telegraph company constructs a telegraph line along the right-of-way of the railroad, surplus space on the telegraph company's poles to accommodate the wires needed by the railroad company for its business can be provided at relatively little expense.

12. The railroad companies have to bring, for their operation, the telegraph wires into the stations, large and small, along their right-of-way; and these same stations into which the wires of the telegraph company go, where it has entered into an exchange of services and facilities contract with the railroad, can be availed of by the telegraph company for the receipt and dispatch of messages in and from that particular locality. In the smaller localities the same employee can under such arrangements perform services both for the railroad and the telegraph company (as is shown by provisions of contracts).

13. From as early as 1885 and continuing thereafter, Western Union entered into complex exchange of service agreements with the railroad companies, and the building up of its ability to render a complete national service to the public has been aided and made possible by this interchange of service and facility arrangements.

14. The country west of the Alleghenies and particularly west of the Mississippi developed along the railroads and the tele-graph grew with the railroads with the result that the telegraph was in many of the localities before the locality was of importance. There could have been no way whereby these communities or the nation could have been served telegraphically if some arrangement similar to the one that the railroads and Western Union now have had not been made because there would have been no economic justification for the building of a telegraph line on highways. The partnership between Western Union and the railroads was a natural one, it had a natural growth, the needs of one fitted in with the needs of the other, and it has remained that way from the early 1850's.

15. Contractual arrangements by Western Union with railroads provide, in somewhat varying form, for a wide variety of services and, as further consideration, usually a sharing of the actual receipts by the telegraph company from business originating from premises of the railroad companies. In 125 of the contracts in effect on the date the suit was brought there are provisions under which the particular railroad companies share in the receipts from commercial telegraph business conducted at railroad offices. The railroads so participating represent 132,000 miles of the 200,000 miles, hereinafter (Finding No. 16) referred to. On the basis of the number of contracts which include receipt sharing provisions, such contracts represent 65.5%; on the basis of mileage 63.2%. The participation is in percentages varying from 5% to 50%. The railroad participation was as low as 5% in only one instance—that of the New York Central System—the minimum participation in other instances being 10%.

16. Some agreements provided among other things that the railroad should not permit any other telegraph company to build a telegraph line along their properties. On December 1, 1937, the date upon which this suit was instituted, the defendant company had in effect 191 such contracts with railroads, and at the present time has in effect 185 contracts of this nature. The railroad contracts cover approximately 200,000 miles of an existing 260,000 miles of railroad rights-of-way. The usual length of a railroad exchange of service contract is about 25 years, but in at least one case, it runs for 50 years.

17. Prior to 1860 Western Union entered into contracts containing exclusive provisions with 17 railroads. The contract

relationships thus initiated between August 14, 1855, the date of the first contract referred to, and January 1, 1860, have continued uninterruptedly until the present time. Between January 1, 1860 and April 10, 1865, Western Union executed contracts containing exclusive provisions with 8 additional railroads with whom continuous contractual relationships have been maintained up to the present time.

18. As illustrative of the general provisions incorporated in exclusive contracts with railroads, reference is made to the contract between Western Union and the Baltimore ond Ohio Railroad Company dated October 15, 1887, attached to the answer as Exhibit "A" and also to the stipulation here as Exhibit "A". Under this contract the railroad on its part agrees, among other things, to furnish the unskilled labor for the maintenance, repair and reconstruction of the telegraph line; to furnish operators at all telegraph stations of the railroad company at its own expense, such operators to act as agents for Western Union in the receipt, transmission and delivery of commercial or public messages; to transport free of charge over its railroad all employees of Western Union when traveling on its business or engaged in its work along the railroad; to transport and distribute free of charge, all poles and other material and supplies of Western Union for the construction, maintenance, renewal and reconstruction of the telegraph line; to transport free of charge the employees of Western Union and the poles and other material and supplies of Western Union required for the construction, maintenance, renewal and reconstruction of their off-line telegraph lines to an amount not exceeding $10,000 per annum and after such $10,000 has been reached to charge Western Union only one-half of the commercial rates for such transportation; to assure to the telegraph company an exclusive right-of-way along the railroad; to keep clear said right-of-way of all trees, undergrowth and other obstructions to the construction and maintenance of telegraph lines so far as the railroad legally may; and to refrain from transporting men or material for the construction, maintenance or operation of any telegraph or telephone line in competition with the business of Western Union except at the railroad company's current local rates. The Western Union on its part agrees, among other things, to maintain, repair and reconstruct the telegraph lines and such wires as either Western Union or the railroad company may place thereon; to provide the skilled labor for such maintenance, repair and reconstruction work; to furnish the use of its main batteries for the efficient operation of railroad wires; to furnish all instruments, local batteries, stationery and other material for commercial business; the free use of all telegraphic patents which Western Union now or may hereafter own; to furnish operators at railroad offices when the number of paid and collect messages sent from any railroad office amounts to 3,000 or more in any one year; to transmit free over the telegraph line all the messages of the officers and agents of the railroad company pertaining to its railroad business; to issue franks to officers of the railroad company authorizing the free transmission of messages beyond or off the line of the railroad to an amount not exceeding $10,000 per year, and to extend to the railroad company half rates after that amount has been exceeded; and to pay the railroad company the sum of $60,000 per annum during the continuance of the agreement.

19. Duplicate telegraph lines along a railroad create a hazard. No railroad would have two telegraph lines if it could get along with one.

20. From 1855 on, the exchange of service and facilities agreements with the railroad companies have contained provisions which gave to the Western Union the right of sole occupancy of the railroad premises for carrying on the telegraph business. The provisions for such exclusive occupancy have related to rights-of-way, and usually to the use of station buildings as well; and have also provided for joint use of employees, and usually a sharing of certain receipts.

21. Typical exclusive provisions by which the railroad in one form or another provides for giving to the Western Union sole occupancy of its premises for carrying on all or particular phases of the telegraph business, are as follows:

(1) Competing carriers not to be furnished right-of-way for telegraph lines.

(2) The right of Western Union to defend exclusive rights in its own name or to use name of railroad company in defending such rights.

(3) The exclusive right to establish and operate telegraph offices in railroad sta-

tions—commercial telegraph business transacted by operators of railroad company.

(4) The exclusive right to establish and operate telegraph offices in railroad stations—commercial telegraph business transacted by operators of Western Union.

(5) No wires of competing carrier to be placed on pole lines of railroad company.

(6) No wires of competing carrier to be connected with railroad stations.

(7) No wires of railroad company to be used in competition with Western Union business.

22. There is no uniformity in the manner in which these various exclusive clauses appear in the particular contracts here under consideration. This may be illustrated by the following table:

Exclusive clause No. 1 does not appear in 42 railroad contracts

Exclusive clause No. 2 does not appear in 92 railroad contracts

Exclusive clause No. 3 does not appear in 5 railroad contracts

Exclusive clause No. 4 does not appear in 83 railroad contracts

Exclusive clause No. 5 does not appear in 144 railroad contracts

Exclusive clause No. 6 does not appear in 116 railroad contracts

Exclusive clause No. 7 does not appear in 120 railroad contracts

23. With a few exceptions, a contract assuring a telegraph company an exclusive right-of-way along railroads and the exclusive right to transact telegraph business in public railroad terminals or stations has been in effect between every important railroad company or system and some telegraph company.

24. The telegraph business originating on the railroad premises varies in amount between the large and small stations. The provisions in railroad contracts giving to Western Union sole occupancy for telegraph purposes of stations on a railroad system, large and small, has enabled the Western Union to provide telegraph service to thousands of places throughout the United States where it otherwise would not have provided that service for the reason that, taking the place alone, apart from the business resulting from its sole occupancy for telegraph service of the railroad premises as a whole, there would not be enough business to justify the expense of opening an office. Western Union's entire system of exchange of service contracts with railroads which makes it possible to afford its complete nationwide service, would not have been created if the contracts had not contained these provisions for sole occupancy for telegraph purposes from the outset.

25. Contracts executed by railroads with telegraph companies are filed with the Interstate Commerce Commission and are open to public inspection.

26. The Postal Telegraph-Cable Company was organized (as heretofore stated in Finding No. 5 herein) in 1883, the year after the completion of the nationwide coverage by the Western Union. The primary purpose of its organizers was to provide terminal, collecting and distributive facilities in the United States for the international Atlantic cable traffic of the Commercial Cable Company. It did not plan complete nationwide coverage, but expected to serve as a domestic connection for the Commercial Cable Company, augmented by such profitable domestic business as it could develop with a reasonable organization.

27. The exchange of service contracts between the Western Union with the railroads are continually expiring. Sometimes they are immediately renewed; sometimes they are allowed to run along from year to year, terminable at any time by either party on notice, before there is a formal renewal. In either case the Postal was free to compete with Western Union for sole contractual relationship, or to negotiate with the railroad company for any other sort of relationship. The Postal sought and obtained exchange of service contracts similar to those of the Western Union and with similar sole occupancy provisions for telegraph business with some railroads, and, for a time, with the Pennsylvania Railroad.

28. From the standpoint of both railroads and telegraph companies, arrangements for single occupancy for telegraph purposes of railroad premises, such as Western Union has with some railroads, and Postal Telegraph with others, are normal, natural and economical arrangements by reason of the inter-relationship of the railroad and telegraph business. Duplication of exchange of service arrangements and multiple occupancy of its premises for telegraph purposes would not appear, from the nature of the case, to have any advantages for a railroad. On the contrary, it would merely be burdensome.

29. It is a reasonable and normal business arrangement for a telegraph company which makes a system contract with a railroad for the exchange of services and the mutual use of facilities and pays a consideration therefor for services rendered by it and railroad participation in its revenues, to protect itself against the railroad making arrangements with another telegraph company by which the railroad would afford the facilities of its premises to that other telegraph company in locations and areas along its line where there is a large volume of telegraph business, while leaving to the first telegraph company the burden of providing its facilities at the points of the railroad system where the business incident to location on railroad premises is, from the nature of the case, lean and unprofitable.

30. In 1890, after seven years of operation by the Postal, that company and the Western Union together transmitted 63,258,762 messages, of which number Western Union transmitted 55,878,762, or 88.3%, and Postal transmitted 7,380,000 or 11.7%. In 1900 together both companies transmitted 79,696,227 messages, 63,176,783 of which were transmitted by Western Union or 79.3%, and 16,528,444 or 20.7% by the Postal. In 1937 together both companies transmitted 201,440,746 messages, of which Western Union transmitted 158,155,102 or 78.5% and Postal transmitted 43,285,644, or 21.5%.

31. The investment in plant and equipment used in domestic telegraph operations by Western Union and Postal were, as of December 31, 1926, $235,368,578 for Western Union and $62,517,355 for Postal. For the year ended December 31, 1939, comparable figures were $304,269,968 for Western Union and $84,540,216 for Postal. The investment in plant and equipment of the two companies during each of the twelve intervening years is substantially in the same ratio.

32. The laws of the various States permit the condemnation of rights of way by telegraph companies along railroads; and Postal has condemned such rights of way generally at a cost of from $10 to $15 per mile in perpetuity. The average cost of a pole line is between $300 and $1,000 per mile. The average cost of a private right of way in perpetuity is between $105 and $135 per mile. Between 70% and 80% of the pole lines of the American Telephone and Telegraph and associated Bell companies, the largest owners of pole lines in the United States, are located on rights-of-way other than railroad.

33. During the forty-seven years of its existence, down to 1930, Postal had been able to do a profitable business. After 1930 the volume of the communications business obtained by the wire telegraph companies fell off drastically. Over a period of years since that time Postal has been unable to earn fixed charges, and Western Union has been unable to earn them during certain of these years.

34. Postal has constructed less than 100 miles of pole lines in the last ten years. Since 1925 Postal has not engaged in any substantial pole line construction. Neither has any other telegraph carrier in the United States. Postal has no policy at the present time whereby it intends to extend all over the country.

35. Postal cannot operate an office with profit at any place where it does not receive revenues amounting to $200 per month. If Postal receives $200 per month competitively with Western Union, the office would have to produce at least $1,000 per month because of the fact that the usual distribution of traffic at places where both companies are represented is Western Union 80% and Postal 20%. Out of Postal's receipts of $200 at such an office it would be required to pay at least $125 per month for a competent operator-manager, leaving a balance of $75 per month out of which to pay rent, cost of completing transmission to destination, etc., to say nothing of any element of profit. Postal formerly maintained an office at the Pennsylvania Station in Newark, New Jersey, where Western Union does not enjoy sole occupancy privileges, but it has been closed. Similarly, it formerly operated an office in the Pennsylvania Station in Harrisburg, Pennsylvania, but it has likewise been closed.

36. Where one telegraph company has sole occupancy of a railroad station for telegraph purposes, the public are not entirely foreclosed from using the service of another company. For example, in the Grand Central Station, New York, occupied by Western Union, there are many public pay telephone stations located at various points in the station and any one desiring to send a message via Postal may do so by informing the telephone operator that a connection with Postal is desired. Messages offered in this manner are for all practical purposes received at the main op-

erating room of Postal without any delay of any kind.

37. There is a certain amount of telegraph business which originates in hotels and the larger hotels are accustomed to lease space on their premises for occupancy for telegraph business. Whether the lease gives sole occupancy for telegraph business or not is determined by the hotel. Such contracts run ordinarily for not more than a year or a few years, and where sole occupancy is given to one company, the other has an opportunity at the end of the contract to ask for joint occupancy or sole occupancy for itself. The presence of two telegraph companies in the hotel does not create any additional telegraph business. If the business is split, it may not be possible for either or both companies to operate without loss and it is normal and reasonable that either company seeking such business to desire sole occupancy and, when the amount of the rent is determined, to know whether it is to receive it.

38. In hotels where the office of only one telegraph company is located, it is always possible to send a message by the company that is not represented. The clerk of the hotel will accept a message and notify the company for whom the message is intended either by call box or by phone and a messenger, if required, is sent to pick it up.

39. At the date of the hearing, Western Union had exclusive hotel contracts in only 96 cities. In 61 cities it has but one exclusive hotel contract and these cities include Boston, Providence, Philadelphia, Wilmington, Nashville, Chicago, Indianapolis, Omaha, New Orleans, Houston, Sacramento, Milwaukee, Denver and Salt Lake City. In New York-Brooklyn there are 13; in only four other cities, Pittsburgh, Miami, St. Petersburg and St. Louis are there more than three. Postal also has exclusive hotel contracts.

40. For the first nine months of 1940 the gross revenues from hotels with which Western Union had exclusive contracts were $828,698, which figure equated to a yearly basis amounts to $1,100,000. It does not appear what expenses are applicable to these gross revenues or that, if there had been joint occupancy instead of sole occupancy, the expenses incident to duplicate investment in facilities and in operation, would have permitted a second company or either company to meet operating expenses on such business.

41. It is a normal business relationship for a hotel which leases space on its premises for the carrying on of another business, to give sole occupancy to a particular concessionaire and the normal rental value, if made to a single concessionaire, may be expected to be greater than to two concessionaires doing the same type of business. This is for the reason that while if there is more than one concession, the expenses of operating such business are duplicated, the amount of business is incident to location in the hotel and is not increased by dual occupancy. It is normal and reasonable for the concessionaire, when the amount of its rental is being determined, to be assured by contract that it will not have to share its occupancy of the premises for the purpose of its business with other occupants similarly engaged.

42. Telegraph companies have branch offices located at some intermediate or upper floor in some important business building. They are intended solely for the accommodation of the tenants in the particular building. Call circuits are established with offices in the building and in response to a signal over such call circuits a messenger is dispatched to pick up telegraph messages. In many instances the telephone is used to summon the messenger from the building branch. Deliveries for tenants in the building are made from the building branch office.

43. Both Western Union and Postal endeavored to obtain leases of space for branch offices in buildings with a provision for sole occupancy for telegraph purposes.

44. There are at least 145 important buildings south of 59th Street, New York City, in which neither telegraph company has an office.

45. Western Union in negotiating leases of space in business buildings has endeavored to do so on an exclusive basis whenever the business in sight has been in sufficient volume to be attractive to a second telegraph company, its purpose being to avoid sharing with another company such business as might be influenced by the proximity of such branch to the source of the business. The amount of business originating in a large office building may exceed that in a fairly sizable town, but in instances where either company has sole occupancy for telegraph purposes in an office building, the other company may reach the tenants of that building by tie lines, call boxes or both, although in the case of call

boxes quicker service is apt to be afforded by the company which has an office inside the building. Telegraph service of the other company is also always available by telephone, which is as quick as any service, so that the telegraph business originating in any such building is not all controlled by the company having an office in the building and delivery to it of incoming messages can be made from the nearest office.

46. A tie line is an arrangement whereby a wire is run into a customer's office from the telegraph company's main office and the customer transmits and receives messages over that wire through the use of his own employee by teleprinter or Morse signals. The call box is a signalling device placed on the premises of the patron by the telegraph company. By pressing a lever on the box a signal is registered in a nearby telegraph branch or main office from which a messenger is dispatched to the customer's premises in response to the signal. In New York City Western Union has sole occupancy provisions in 141 and Postal in an unstated number of buildings.

47. Building leases run from three to five years; some for shorter periods of from one to two years.

48. When an exclusive lease governing space in an office building is about to expire, there is competition between Western Union and Postal to retain or gain access to that building.

49. With the advent of the teleprinter, the building branch office became less important. Customers with large telegraph files realized that there was some delay in forwarding their business through the building branch. When the teleprinter came into general use, these customers demanded that the commercial telegraph companies furnish them with this equipment. A teleprinter is an apparatus which resembles a typewriter in general appearance. An employee of the patron sends a signal over the teleprinter, gets the response that the circuit is clear and available and then starts in transmitting his message. As he does so the message is recorded automatically in the main office of the telegraph company in the city. By this operation the patron cuts out all branch offices and gets his message quickly into the heart of the great relay office in the city.

50. The sole occupancy provisions in leases from office buildings to the telegraph companies are in accord with the normal practice of the owner of an office building, that when they lease space on their premises to a concessionaire for carrying on a particular type of service business, they provide for the sole occupancy of the premises for his type of business. It is not unreasonable for a lessee to seek the full benefit of location by sole occupancy provisions and to be assured when the amount of rent is being determined, as to whether he will or will not be given that sole occupancy.

51. The Western Union has certain arrangements for sole occupancy for telegraph business in some sport parks and exchanges. Its gross revenue received from such services in the year ended December 31, 1937 was $800,000, which amount dropped to $550,000 for the year 1940. About 95% of the transmission service rendered was by means of tickers. Postal Telegraph does not have a ticker service.

52. The provision for sole occupancy for telegraph service of minor league baseball parks and of the minor exchanges is a normal exercise by the owner of the premises of its right to select a concessionaire to whom he is willing to lease space on his premises for a particular business and to assure that sole occupancy, when the amount of rent is being determined, by provisions in the lease.

53. Both Western Union and Postal have extended their facilities for serving the public by the use of persons or concerns who are engaged in some other form of business, such as filling stations, in soliciting and receiving telegraph messages for transmission. Such agency provisions make it possible for an extension of service where the amount of business would not permit the use of full-time employees or the rental of separate space.

54. Postal has nearly as many of such agents as Western Union. Forms of contract used both by Postal and Western Union in establishing such agencies contain provisions that the agent will not transact any telegraph business for any other telegraph company.

55. Such provisions for the exclusive service in a particular business by an agent are the normal and proper incidents of the relationship between principal and agent.

56. In 1883 when Postal was organized the only way in which instantaneous transmission of intelligence could be effected between persons at distant points was by telegraph. The only competition for business of this character was that between

Western Union and the Postal. Later the long distance telephone became available for distant instantaneous communication and the rates for such long distance telephone service have been progressively reduced so that at the present time many communications which formerly had to be sent by telegraph are now sent by telephone. Both telegraph companies have always offered night telegraph service at reduced rates, the messages being deliverable on the morning of the next ensuing business day. With the development of the air mail, many communications which formerly went by night message can now be sent and are sent by air mail, especially messages from coast to coast involving the longest and most remunerative hauls. Wireless telegraphy has been developed and two wireless companies engaged in competition with the wire telegraph companies between twelve of the largest cities in the United States, the wireless companies offering a greater number of words in the different classifications for the same rates charged by the wire telegraph companies. Users of the telegraph who send messages in large volume have in later years been afforded the opportunity to lease private wires from both the telegraph companies and from the Bell System, and are also afforded the use of the Bell System special telegraph service known as TWX (Teletypewriter exchange service) which is in effect the lease of a wire or circuit for a short period at rates based on the period of time consumed. The TWX service is offered at very low rates. These rates which have been met by the telegraph companies for a different method of handling correspondence in order to save as much as possible of the business that would be attracted to the TWX service are so low that the telegraph companies cannot possibly hope to make a profit under them.

57. While a public telegraph business is dissimilar to and distinct from other substitute communication services, nevertheless the field of competition in which the Western Union and Postal have been engaged has now become the field of speedy communication—by wireless, by oral and written wire message, and the written message carried by airplane.

58. It does not appear what the total volume of business is in this field of competition of the communications industry. But of that portion of business in that field secured by competitors affording service by written communication by wire or wireless, the Western Union in 1937 secured about 64.2%, American Telephone and Telegraph 19%, Postal 15.5%, Mackay Radio and Telegraph Co. and R.C.A. Communications, Inc., 1.3%.

59. The Bell System's telegraph revenue for the calendar year 1939 amounted to $23,454,135, divided as follows: TWX $7,668,581; leased wires $15,576,115; and "other telegraph service" $209,439. The gross revenues of Western Union for the calendar year 1939 were $88,248,465 and those of Postal $20,405,767, a total for the three companies from telegraph services of $132,108,367.

60. The total amount of revenue received by Western Union for the calendar year 1940 from terminal stations, hotels, exchanges and sports parks wherein exclusive Western Union offices are maintained was $2,721,522 or 1.3% of the total telegraph revenues of the American Telephone and Telegraph Company, Western Union and Postal. If the figures for the other competitive factors in the communications industry, the oral services of the telephone company, the air mail and government operated communication services were available, the percentage of revenue obtained by Western Union from the above offices would be only a fraction of 1.3% of the total.

61. No Western Union contract with any person or company prevents that person or company from giving business to any competitor.

62. From the very nature of the communications industry, it is not to be expected, nor would it be convenient or economical from the standpoint of the public, that there should be any considerable number of units. The vital competition in the communications business is between concerns competing for a share of that business respectively by service by telephone, by wire or wireless, by service by written wire message, by service by written wireless message, by service by written message by airplane or special delivery.

63. Postal came into the field when Western Union already had nationwide coverage and a complete system of railroad contracts. That coverage and that system did not create a "monopoly" of the telegraph business and Postal was able to enter and build up a substantial and successful wire message business. There is no showing that any difficulties which Postal

has encountered since 1929 in a period of a declining share of wire message business in the highly competitive communications industry have been due to the sole occupancy contracts of the Western Union or that, if such contracts were no longer in force, the owners of the premises, whether railroad or otherwise, would voluntarily afford to Postal the opportunity for duplication of facilities on their premises or that Postal could afford to enter upon the additional capital expenditures and operating expenses entailed by such duplication.

64. Defendant, Newcomb Carlton, has been chairman of the Board of Directors of the Western Union since 1933 prior to which time he was President of the company, his occupancy of the office of President having begun in 1913. As President, defendant Carlton derived his authority from Article VI of the by-laws of the company, which states that the President shall be the chief executive officer of the company and shall enforce the orders of the Board of Directors and the Executive Committee. At a meeting of the Executive Committee on December 7, 1910, that Committee delegated authority to the President to deal in his discretion with all matters of an ordinary, routine character where the amount involved did not exceed $1,000 or a payment in excess of $5,000 a year. The authority thus delegated in general contemplated the opening, closing, changing, fitting up and renovating of offices; the renewal and adjustment of existing leases; the rental of additional space for office purposes and the extension of lines to new offices and new office locations. The delegation of authority above described continued until May 4, 1920, when it was amended by the Executive Committee so as to grant to the President increased authority in the opening and fitting up of new offices to not exceeding an annual rental of $10,000, and an installation cost as approximately estimated not in excess of $10,000.

65. Defendant Willever is First Vice President in Charge of the Commercial Department and a member of the Board of Directors of Western Union. Defendant Willever was chosen as First Vice-President by the Board of Directors in accordance with Article III of the by-laws, but derives his authority solely from a delegation by the President. The material portion of the delegation of authority to defendant Willever by the President was authority to deal, in his discretion, with all matters in his department, including commercial cable operations in the United States, of an ordinary or routine character, when the amount involved did not exceed $1,000, or an expenditure in excess of $5,000 per year. The delegation thus made in general contemplated the opening, closing, changing, fitting up and renovation of offices where the amount involved did not exceed $5,000; the renewal and adjustment of existing office leases; and the rental of additional space for office purposes. While the delegation of authority by the President recited that defendant Willever was authorized to use his own discretion in the matters referred to, the President could at any time have revoked the authority delegated to him without previous notice.

66. Defendant McKisick, to and including June 30, 1940, was Vice President and Secretary and a member of the Board of Directors of the Western Union. On September 2, 1914, by delegation of authority from the President, defendant McKisick was expressly authorized to sign such written contracts of a general nature as the President might refer to him from time to time for that purpose. In exercising this authority defendant McKisick carried out the directions of the President. As Secretary of Western Union, defendant McKisick affixed the seal of the corporation and it was his official duty to affix such seal to all contracts when directed by the President or the appropriate Vice President.

67. The duties of the Executive Committee are set forth in Article IV of the by-laws as follows: "The Board of Directors may designate eight of their number, including the President, who shall constitute an Executive Committee, who shall, for the time being, have and exercise all the powers of the Board of Directors in the management of the business and affairs of the company, and have the power to authorize the seal of the company to be affixed to all papers which may require it."

68. As members of the Board of Directors, defendants Carlton, Willever and McKisick have never specifically passed upon the question as to whether any particular contract should be exclusive or non-exclusive, but completed contracts containing exclusive provisions from time to time have been executed by the officers of the company under the direction of the President and the President has reported to the Board of Directors that contracts have been made

with the other parties thereto, and the Board has voted that the same be approved.

 69. The evidence does not establish that the contracts in question herein, either singly or taken together, constitute any substantial restraint of trade or commerce or substantially affect competition in the communications industry. Nor does the evidence establish on the part of the defendants any conspiracy or combination in restraint of trade or monopolization or attempt to monopolize the communications industry or any part thereof.

### Conclusions of Law.

 1. This court has jurisdiction of this cause under the provisions of the act of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies."

2. The defendant company is engaged in interstate commerce in telegraph communication. This commerce covers the entire United States and is carried on in part within the Southern District of New York.

3. The defendant company and its officers, the individual defendants, have not engaged in a conspiracy to restrain trade and commerce in telegraph communication and to monopolize such commerce by making exclusive contracts with railroad, transportation and terminal companies, the owners of hotels, public buildings and sports arenas, for the purpose of excluding competing telegraph companies from such premises and therefore have not violated Sections 1 and 2 of the Sherman Anti-Trust Act.

4. The exclusive contracts entered into by the defendant company and railroad, transportation and terminal companies, the owners of hotels, public buildings and sports arenas, while gaining for the defendant company a competitive advantage, do not constitute an unreasonable restraint of interstate trade and commerce in telegraph communication in violation of Section 1 of the Sherman Anti-Trust Act.

5. The exclusive contracts with railroad, transportation and terminal companies, owners of hotels, business buildings and sports arenas entered into by defendant through its officers and agents, do not form a part of a nationwide plan to exclude competing telegraph companies from such locations, but rather are the usual incidents attendant to a vigorous prosecution of the business of the defendant, and the defendant company and its officers and agents have not attempted by means of such contracts to monopolize interstate trade and commerce in telegraph communication in violation of Section 2 of the Sherman Anti-Trust Act.

6. The exclusive provisions of the contracts between the defendant and the railroad, transportation and terminal companies, owners of hotels, business buildings and sports arenas are lawful and valid and not in violation of the terms of Sections 1 and 2 of the Sherman Anti-Trust Act.

7. The motion of defendants to dismiss for failure to join indispensable parties is denied.

8. Petitioner is not entitled to the relief prayed for in its petition.

9. An order should be entered dismissing the petition, as prayed for by defendants in their answer.